In the Matter of the TITLE, BALLOT TITLE AND SUBMISSION CLAUSE, AND SUMMARY ADOPTED MAY 16, 1990 by the Board and Pertaining to the Proposed Initiative Under the Designation "Tax Reform," and the Motion for Rehearing Denied on June 4, 1990.

Freda A. Miklin, Petitioner,

and

Richard G. Brown and Ronald D. Smith, Respondents,

and

Natalie Meyer, Charles B. Howe and Douglas G. Brown, Title Setting Board.

No. 90SA251.

Supreme Court of Colorado, En Banc.

July 16, 1990.

Geoffrey T. Wilson, Denver, for petitioner.

Mark Bender, James H. Beimford, Denver, for respondents.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Maurice G. Knaizer, Deputy Atty. Gen., Denver, for Title Setting Bd.

Amelia Buchanan, Denver, for amicus curiae Colorado Dept. of Revenue.

Justice MULLARKEY delivered the Opinion of the Court.

Freda A. Miklin, a registered elector, brings this original proceeding pursuant to section 1–40–102(3), 1B C.R.S. (1989 Supp.) to challenge the title, ballot title and submission clause, and summary adopted by the Title Setting Board (Board) for a proposed constitutional amendment concerning sales and use tax. The title, ballot title and submission clause and summary as well as the text of the initiative are appended to this opinion. Miklin claims that the Board lacked jurisdiction to adopt a title, ballot title and submission clause, and summary for this initiative because the initiative had not been submitted to the legislative research and drafting offices of the general assembly for review and comment as required by Article V, Section 1(5) of the Colorado Constitution. She also alleges that the summary prepared by the Board is misleading with respect to the effect of the proposed initiative on food and services. Finally, Miklin contends that the summary violates section 1–40–101(2), 1B C.R.S. (1989 Supp.), because it does not adequately explain the fiscal impact of the proposal.

While we reject Miklin's contention with respect to the fiscal impact summary, we agree with her other contentions. Accordingly, we reverse the decision of the Title Setting Board and remand the matter with directions.

## I.

■ We first consider Miklin's jurisdictional argument. Article V, Section 1(5) of the Colorado Constitution provides:

> The original draft of the text of proposed initiated constitutional amendments and initiated laws shall be submitted to the legislative research and drafting offices of the general assembly for review and comment. No later than two weeks after submission of the original draft, unless withdrawn by the proponents, the legislative research and drafting offices of the general assembly shall render their comments to the proponents of the proposed measure at a meeting open to the public, which shall be held only after full and timely notice to the public. Such meeting shall be held prior to the fixing of a ballot title. Neither the general assembly nor its committees or agencies shall have any power to require the amendment, modification, or other alteration of the text of any such proposed measure or to establish deadlines for the submission of the original draft of the text of any proposed measure.

*See also* section 1-40-101, 1B C.R.S. (1989 Supp.) (initiative procedure). The constitutional provision was adopted by the voters in 1980 and has not been construed by this court prior to this case. Subsection (5) requires that the original draft of a proposed constitutional amendment be submitted to the "legislative research and drafting offices of the general assembly" (legislative offices) for review and comment. The legislative offices' comments must be presented in a public meeting to be held "prior to the fixing of a ballot title." The comments made are not binding on the proponents of an initiative, although the proponents may choose to amend the initiative in light of such comments. Subsection (5) requires only that the original text of a

proposed initiative be submitted for review and comment; there is no requirement for submission of an amended initiative after the original has been submitted. *See* Legislative Council of the Colorado General Assembly, *An Analysis of 1980 Ballot Proposals*, Research Publication No. 248 (1980) at 2–3. Section 1-40-101(2) provides that, after receiving comments from the legislative offices at the public meeting, the proponents then submit "the original or amended drafts, as the case may be" to the Secretary of State for preparation of the title, ballot title and submission clause, and summary.

The case before us concerns two proposed constitutional amendments which were initiated by the same proponents, Richard G. Brown and Ronald D. Smith, who, along with the Board, are the respondents in this matter. For convenience, we will refer to the first proposed amendment as the April initiative and to the second as the May initiative.

The proponents submitted an original version of the April initiative to the legislative offices on April 5, 1990. After receiving the legislative offices' comments at a public meeting, the proponents amended the initial draft and submitted it to the Secretary of State on April 13, 1990. The Board set a title, ballot title and submission clause, and summary for the initiative on April 18, 1990. Apparently no appeal was taken from that decision of the Board and the April initiative then was ready for the circulation of petitions. The record before us does not include the title, ballot title and submission clause, and summary for the April initiative.

On May 10, 1990, the proponents submitted the May initiative to the Secretary of State for the Board to set a title, ballot title and submission clause, and summary. This proposed amendment was not sent to the legislative offices before it was filed with the Secretary of State and the legislative offices did not review and provide comments on the May initiative at a public meeting. At a hearing held before the Board on May 16, 1990, Miklin challenged the jurisdiction of the Board because the

May initiative had not been submitted to the legislative offices for review and comment. The Board unanimously rejected Miklin's contention. At a rehearing on June 4, 1990, the Board again rejected Miklin's jurisdictional challenge on a 2–1 vote.

The proponents argue that they were not required to submit the May initiative to the legislative offices for review and comment because the May initiative was simply an amended version of the April initiative. Since Article V, Section 1(5) only requires submission of the original draft of a proposed initiated constitutional amendment, the proponents conclude that they could bypass the legislative offices and submit the May initiative directly to the Secretary of State for title setting by the Board. We disagree.

The April initiative was much longer and more comprehensive than the May initiative. The legislative offices identified ten major purposes of the April initiative. These were as follows:

(1) To add a new Article XXVII to the Colorado Constitution concerning fiscal policies for all governmental entities and to declare that the provisions of the article, with certain exceptions, shall supersede any other constitutional provision, statute, home rule charter, local ordinance, or local resolution to the contrary.

(2) To reserve the initiative and referendum power to the registered electors of all governmental entities with respect to any taxation matter; to prohibit any tax imposed by a governmental entity from taking effect sooner than thirty days following enactment; to specify the time period during which petitions may be circulated; to prohibit the imposition of any standards upon such initiative and referendum process which are more stringent than are necessary to prevent fraud and assure a fair and honest process; to prohibit governmental entities from contributing to initiative or referendum campaigns on tax issues, from advocating any position concerning an initiated or referred tax measure, or from influencing the outcome of any initiative or referendum election; and to

require the single-subject restriction of Article V, Section 21 of the Colorado Constitution to apply to any measure submitted to the people.

(3) To require the General Assembly to establish a uniform statewide system of collection, administration, and enforcement of sales and use tax and, in connection therewith, to establish a uniform sales and use tax base; to prohibit food and services from being included in said tax base except when approved by the registered electors; to allow local governments to collect, administer, and enforce sales and use taxation in certain circumstances; and to require the General Assembly to establish a combined rate of total sales and use tax which may be levied and to allow such maximum rate to be exceeded in certain circumstances.

(4) To prohibit governmental entities from imposing any tax on the transfer of real property.

(5) To guarantee citizens a judicial remedy for illegal or unauthorized taxation; to require the General Assembly to establish an administrative and a judicial process for the resolution of tax disputes between taxpayers and governmental entities; to specify minimum requirements for such process; to prohibit any presumption in favor of any governmental entity in such process; and to require that all evidence presented in such process be reasonably considered.

(6) To require the General Assembly to establish expenditure limitations for school districts; to impose constitutionally created expenditure limitations on school districts if the General Assembly fails to act; to impose expenditure limitations on all other governmental entities for fiscal years commencing after the effective date of the article based upon the annual percentage change in state personal income; to impose a expenditure limitation on governmental entities for the 1992 budget year which may be exceeded only by vote of the registered electors; to provide for such budgetary limitation to be exceeded by a vote of two-thirds of each house of the General Assembly or by voter approval; to allow

for the adoption of emergency budgets by a vote of two-thirds of the governing body of any governmental entity; to specify that certain occurrences do not constitute an emergency; and to set forth expenditures which are not subject to such expenditure limitations.

(7) To prohibit the state from imposing any new state-mandated programs or any increased level of service for existing state-mandated programs upon local governmental entities without providing the necessary funding for administration and implementation; to prohibit the reduction of state funding for existing state-mandated programs unless due to reduced service levels; and to adjust the budgetary expenditure base when program responsibility is transferred or eliminated or when necessary to conform to a federal or judicial mandate.

(8) To allow governmental entities to create a reserve fund; to impose a limitation on the amount of such reserve fund which may be exceeded only upon voter approval; and to require the distribution of moneys in excess of the reserve for certain purposes.

(9) To impose a limitation on the annual increase in property tax levied by any governmental entity based upon the annual percentage change in state personal income.

(10) To specify that the provisions of the article shall not impair the payment of principal or interest on any lawfully incurred debt of any governmental entity which is outstanding on the effective date of this article.

In contrast to the April initiative, the May initiative is limited. It is focused on sales and use tax as described in (3) above but includes a provision like (4) prohibiting real estate transfer taxes and another provision similar to a portion of (5) prohibiting a presumption in favor of a governmental agency in tax disputes.

The proponents point out that the language of the May initiative was taken from the April initiative, although in some instances the provisions were edited or reordered. Since the legislative offices had an opportunity to examine provisions which were substantially the same in the April initiative, the proponents argue there is no need for review and comments by the legislative offices of the May initiative. We reject this argument for two reasons.

First, it is contrary to the plain language of Article V, Section 1(5). The constitution requires the legislative offices to present their comments at a public meeting and expressly states that "[s]uch meeting shall be held prior to the fixing of a ballot title." Here, there was no such public meeting prior to setting the ballot title for the May initiative. The only public meeting was held prior to setting the ballot title for the April initiative. The April public meeting cannot serve as the constitutionally required predicate for setting two different titles for two initiatives.

Second, this argument misperceives the purpose of the comment and review process. While it is true that the comments and review are intended in part to assist the proponents in drafting their initiative, there is an overriding public purpose served by the presentation of comments and review in a public meeting. Prior to the amendment of Article V, Section 1(5) in 1980, the legislative offices provided review and comments to the proponents of initiatives but the review and comments were confidential until the ballot title was established. The comment process was opened to the public by the 1980 constitutional amendment. As explained by the Legislative Council's analysis, the 1980 amendment to Article V, Section 1(5) meant that "the comment procedure would be designed to inform the public, as well as proponents, of the potential impact of the *original* draft of any proposed initiative." *1980 Ballot Proposals* at 3 (emphasis in original).

In presenting the popular arguments in favor of the proposed amendment to Article V, Section 1(5), the Legislative Council summarized the significance of opening the comment process to the public:

> The requirement that the review and comments of the legislative agencies be presented to the proponents of a pro-

posed initiative at a meeting open to the public is a significant improvement over the current practice which provides for a confidential meeting with proponents. An open public meeting would help assure that all relevant questions and issues surrounding the proposals are raised at the proper time—before the circulation of the petition for signatures. At present, very little information is available to persons signing petitions other than that provided by sponsors and circulators of the petitions. Public disclosure from the beginning would enhance the likelihood of an informed electorate which is essential to a constructive initiative process.

*1980 Ballot Proposals* at 4. Without the public meeting for comments and review on the May initiative, the public would have no way to know that some portions of the April initiative had been revised and resubmitted for the setting of a new title. Contrary to the constitutional requirement, there was no opportunity for public analysis of the May initiative before it was submitted to the Secretary of State for fixing the title. Since the proponents did not comply with the constitutionally-required procedure for comments and review, the Board was without jurisdiction to set the title, ballot title and submission clause, and summary for the May initiative. *See Colorado Div. of Employment v. Industrial Comm'n,* 665 P.2d 631 (Colo.App.1983) (administrative agencies are without power to act contrary to the law or clear legislative intent or to exceed the authority conferred upon them by statute); *Dodge v. Department of Social Servs.,* 657 P.2d 969 (Colo. App.1982) (an administrative agency must comply strictly with its enabling statutes, and such agency has no authority to set aside or circumvent legislative mandates).

Because the proponents may wish to resubmit the May initiative after following the proper procedure, we also will consider Miklin's challenges to the summary fixed by the Board.

## II.

Miklin argues that sections of the summary pertaining to taxation of food and taxation of services were defective. Furthermore, Miklin asserts that the summary did not contain an adequate explanation of the fiscal impact of the proposal as required by section 1–40–101(2), 1B C.R.S. (1989 Supp.). We will address each of these arguments.

■ The Board must prepare a summary of the initiative which is clear and concise, and a true and impartial statement of the intent of the proposal. The summary cannot be an argument, or be likely to create prejudice, for or against the measure. *See* § 1–40–101(2), 1B C.R.S. (1989 Supp.); *In re Casino Gaming Initiative,* 649 P.2d 303, 306 (Colo.1982). If, the Board finds that the proposed initiative will have a fiscal impact on the State or on any of its political subdivisions, the summary must include an estimate and explanation of the fiscal impact. *In re Constitutional Amendment Respecting the Rights of the Public to Uninterrupted Service by Public Employees,* 200 Colo. 141, 613 P.2d 867 (1980); § 1–40–101(2).

This court's evaluation of the legal sufficiency of the summary is guided by the following well-established principles:

(1) [W]e must not in any way concern ourselves with the merit of the proposed [initiative] since, under our system of government, that resolution rests with the electorate; (2) all legitimate presumptions must be indulged in favor of the propriety of the board's action; and (3) only in a clear case should a title prepared by the board be held invalid.

*Bauch v. Anderson,* 178 Colo. 308, 310, 497 P.2d 698, 699 (1972); *In re Proposed Initiative on Parental Notification of Abortions for Minors,* 794 P.2d 238, 240 (Colo. 1990).

■ Unless the summary adopted by the Board is clearly misleading or does not fairly reflect the purport of the proposed amendment, we will not interfere with the Board's choice of language. *In re Increase of Taxes on Tobacco Products,* 756 P.2d 995, 999 (Colo.1988). In reviewing the Board's summary, we must ensure that neither signers of the initiative nor electors

voting on the initiative will be misled by reading the summary. *In re Matter of a Proposed Constitutional Amendment Under the Designation of "Pregnancy,"* 757 P.2d 132, 134 (Colo.1988). A summary is not intended to fully educate people on all aspects of the proposed law, and it need not set out in detail every aspect of the initiative. *In re Increase of Taxes on Tobacco Products,* 756 P.2d at 998; *In re Proposed Constitutional Amendment Under the Designation of "Pregnancy,"* 757 P.2d at 137.

### A.

■ Miklin first argues that the summary regarding inclusion of food in a sales tax base does not express clearly the meaning and the intent of the proposed amendment and violates the applicable statutory standard because it is untrue and likely to create prejudice in favor of the proposal. We agree.

The summary approved by the Board on May 16, 1990 contains the following statement concerning food:

> Food shall not be included in the tax base without approval of the registered electors.

Miklin first argues that this statement in the summary is untrue. The proposed amendment at Section 18A(5)(b) expressly provides that food for domestic home consumption shall be included in the sales tax base if a local jurisdiction has such a tax in effect on January 1, 1990. In other words, local sales taxes on such food will be "grandfathered" by the proposed amendment. Contrary to the statement in the summary, no further approval by the registered electors would be required to permit a city to continue to include food in its tax base. Thus, for the residents of numerous jurisdictions that tax food for home consumption on January 1, 1990,[1] food will continue to be taxed and will be included in the local sales tax base. For these jurisdictions, enactment of the proposal will not have the effect stated by the summary.

Furthermore, Miklin asserts that food that is not purchased for domestic or home consumption currently is taxed as part of the state sales tax base and thus will continue to be included in the tax base if the proposed amendment is adopted.

Second, Miklin asserts that the statement in the summary is likely to create prejudice in favor of the proposal. She argues that an exemption of food from the base would be of considerable interest to voters. According to Miklin many electors could reach the mistaken conclusion that, if the proposal were enacted, food would not be included in the tax base without approval by the electors.

The proponents reply by pointing out that the summary need not set out in detail every aspect of the initiative. *See Proposed Constitutional Amendment Under the Designation of "Pregnancy,"* 757 P.2d at 137. They assert that the summary is not intended to fully educate the voters on all aspects of the proposed law, but rather that the details can be gathered from reading the proposed initiative. The proponents also contend that Miklin's argument ignores the sentence in the summary which states that the measure "specifies exceptions to the uniform sales and use base."

We conclude that the language approved by the Board does not "correctly and thoroughly summarize the content of the proposed initiative," *In re Proposed Constitutional Amendment Under the Designation of "Pregnancy,"* 757 P.2d at 136. The statement that "food shall not be included in the tax base without approval by the registered electors" is misleading. It is likely that many electors mistakenly would believe that if the proposal were to be enacted, food would not be included in the tax base without approval by the registered electors. In fact, food purchased for immediate consumption (*e.g.,* restaurant meals) would continue to be included in the state tax base, *see* section 39–26–104(1)(e), 16B C.R.S. (1982), and, in many local jurisdictions, food purchased for domestic con-

---

1. According to the record, 192 jurisdictions (166 municipalities and 26 counties) taxed food for

home consumption on January 1, 1990.

sumption would be included in the tax base because of existing local government ordinances or resolutions.

Although the summary does state that the measure "specifies exceptions to the uniform sales and use tax base," this statement does not adequately qualify the general assertion that food shall not be included in the tax base without approval. We conclude that the language concerning taxation of food is untrue. It is likely to create prejudice in favor of the proposal and to mislead voters.

### B.

▬ Next, Miklin argues that the statement in the summary regarding taxation of services does not clearly express the meaning and intent of the proposed amendment, and that it is untrue and likely to create prejudice in favor of the proposal. We agree.

The relevant portion of the summary approved by the Board on May 16, 1990 provides:

> Until July 1, 1997, services are prohibited from being included in the tax base unless approved by a two-thirds vote of both houses of the General Assembly.

Miklin argues that the message of the summary is clear and tells voters that they will not have to pay a sales tax for services until January 1, 1997 unless approved by a two-thirds vote of both houses of the general assembly. Contrary to the summary statement, asserts Miklin, services currently are part of the state sales tax base and will be included in the tax base if the proposed amendment is enacted without any requirement for approval by the legislature. The proposed amendment at Section 18A(4)(c)(I) provides:

> The general assembly shall not include services in a uniform statewide base which are not part of the statewide base in effect on January 1, 1990 except by a vote of two-thirds of each house of the general assembly.

In addition, Miklin asserts that the following services currently are, and on January 1, 1990, will continue to be, included in the state tax base: telephone and telegraph services, gas and electric services for commercial consumption, and the transaction of furnishing rooms or accommodations.

Thus, according to Miklin, the statement in the summary does not correctly and fairly summarize the content of the proposed initiative. Furthermore, she asserts that the summary statement is likely to create prejudice in favor of the proposal because voters may believe that, under the proposal, services will not be included in the tax base and thus that the enactment would mean the end of sales taxation of lodging, interstate telephone service and commercial gas or electric service.

The proponents argue that the thrust of the proposal is that the general assembly cannot include *new* services in a uniform base. The proponents state that because the general assembly is not required to continue to tax services which were a part of the statewide base in effect on January 1, 1990, it would be speculative for the Board to state whether the services will be included if the measure passes. Furthermore, proponents argue that because of the need for brevity, the summary did not list all of the exceptions and that the summary is not clearly misleading because it does not indicate that exceptions exist. Also, proponents allege that the services referred to in the proposed initiative are personal services rather than services in the nature of a product or commodity, such as interstate telephone calls, lodging, etc., which are included in the tax base.

We conclude that the summary's statement regarding taxation of services is untrue and misleading and likely to create prejudice among the voters. This is because, contrary to the statement in the summary, the proponents' proposal does not prohibit inclusion of services in the tax base, but rather only prohibits the addition of new service taxes to the tax base without the requisite legislative approval. Although the summary need not set out every detail and exception to the initiative, here brevity has been taken to the extreme. Moreover, in response to the proponents' allegations, we find that the text of the

proposed amendment does not distinguish between personal services or services in the nature of a product or commodity in the section regarding service taxation and that the term "service" is not defined to include such a distinction.

### C.

Finally, Miklin argues that the summary does not contain an explanation of the fiscal impact of the proposal as expressly required in section 1–40–101(2). Section 1–40–101(2) requires that the summary shall include an estimate of the fiscal impact of the proposal "together with an explanation thereof." The summary approved by the Board on May 16, 1990 states that the measure "is expected to have a significant fiscal impact in lost state and local government revenues, but the amount of the impact is indeterminate."

Miklin argues that the summary does not contain an explanation of why the proposal is expected to have a significant impact in lost state and local revenues. Miklin argues that the omission of an explanation is not attributable to a lack of specific information. The Office of State Planning and Budgeting (OSPB) submitted to the Board data explaining projected increased costs of tax collection and decreased tax revenues, and the Board apparently relied on that data to reach its conclusion regarding the fiscal impact of the initiative. From this fact, Miklin contends that the Board should have used the OSPB data to formulate an explanation of its conclusion that the pro-

posal would have a significant fiscal impact in lost state and local revenues.[2]

The proponents contend that the amount of fiscal impact in lost state and local government revenues was indeterminate because of the variables involved. As such, any further explanation as to why or how state and local revenues would be significantly impacted would be speculative and likely would be prejudicial rather than clarifying and informative. Furthermore, proponents assert that in their opinion the fiscal impact analysis prepared by OSPB, and relied on by Miklin, was "inherently flawed" and "incorrect in its basic assumptions."

■ We previously have upheld fiscal impact statements for proposed initiatives which merely stated that the fiscal impact was indeterminate due to the variables involved and provided no further explanation. *See In re Casino Gaming Initiative,* 649 P.2d at 307; *In re Sale of Table Wine in Grocery Stores Initiative,* 646 P.2d 916 at 923 (Colo.1982); *In re Initiated Constitutional Amendment Respecting Rights of the Public to Uninterrupted Services by Public Employees,* 609 P.2d 631 at 632 (Colo.1980). These cases suggest that a separate explanation of the fiscal impact, although preferable in most cases, is not required when the fiscal impact cannot reasonably be determined from the materials submitted to the Board due to the variables or uncertainties inherent in the particular issue.

**2.** Miklin submits the following explanation as an addition to the existing summary submitted by the Board. The suggested language, below, is based entirely upon OSPB's submission to the Board:

By way of explanation, the amendment may shift the burden of proof in tax proceedings to governmental entities. If the burden of proof is shifted, the state and local governments will incur increased costs for tax collection and tax revenues may be decreased. State collection of all sales taxes would be required. If enforcement levels are not kept constant, significant revenue losses may result to both the state and local governments from decreased sales tax collections. In addition to the approximately 55 additional enforcement personnel which would be required to keep en-

forcement levels constant, the state would need to hire additional employees for collection and administration. Home rule municipalities which currently collect their own taxes are estimated to lose revenues currently received through licensing out-of-city retailers to collect sales taxes on deliveries into the cities. The initiative establishes the state sales and use tax base as the uniform base. Since the state base is considerably narrower than the current tax base of many local governments, local government revenues will be significantly reduced. The initiative may impact the ability of local governments to float or refund revenue bonds. Additional state and local revenues may be lost from the broader definition of food that is exempted from state and local taxes.

■ Accordingly, we conclude that the Board did not violate the statute by failing to provide a more detailed explanation regarding the fiscal impact statement. The record indicates that the Board considered the variables and contingencies involved in determining the fiscal impact and reasonably concluded that the impact was indeterminate.

In summary, we reverse the decision of the Board for lack of jurisdiction and we remand with directions to dismiss the proponents' request to set the title, ballot title and submission clause, and summary.

### APPENDIX A

#### Tax Reform

The title as designated and fixed by the Board is as follows:

AN AMENDMENT TO THE COLORADO CONSTITUTION TO PROHIBIT IN ANY TAX DISPUTE PROCEEDING ANY PRESUMPTION IN FAVOR OF A GOVERNMENTAL ENTITY; TO REQUIRE THE ESTABLISHMENT OF A UNIFORM STATEWIDE SYSTEM OF SALES AND USE TAX; AND TO PROHIBIT FUTURE REAL ESTATE TRANSFER TAXES.

The ballot title and submission clause as designated and fixed by the Board is as follows:

SHALL THERE BE AN AMENDMENT TO THE COLORADO CONSTITUTION TO PROHIBIT IN ANY TAX DISPUTE PROCEEDING ANY PRESUMPTION IN FAVOR OF A GOVERNMENTAL AGENCY; TO REQUIRE THE ESTABLISHMENT OF A UNIFORM STATEWIDE SYSTEM OF SALES AND USE TAX; AND TO PROHIBIT FUTURE REAL ESTATE TRANSFER TAXES?

The summary prepared by the Board is as follows:

This measure requires that, in regard to tax disputes, evidence of both the government agency and the taxpayer shall be reasonably considered. It prohibits any presumption favoring a government agency in any tax dispute proceeding.

This measure requires the General Assembly to establish a uniform statewide system of collection, administration, and enforcement of sales and use tax for all levels of government, including a uniform sales and use tax base. It specifies exceptions to the uniform sales and use tax base. Until July 1, 1997, services are prohibited from being included in the tax base unless approved by two-thirds vote of both houses of the General Assembly. Food shall not be included in the tax base without approval by the registered electors. The General Assembly must establish a combined rate of total sales and use tax which may be levied by all governmental entities and which may be exceeded in certain circumstances.

This measure prohibits real estate transfer taxes, except for real estate transfer taxes in effect as of January 1, 1990.

The measure is expected to have a significant fiscal impact in lost state and local government revenues, but the amount of the impact is indeterminate.

### APPENDIX B

#### PROPOSED AMENDMENT TO THE COLORADO CONSTITUTION

*Be it enacted by the People of the State of Colorado:*

SECTION 1. Article X of the Colorado Constitution, as amended, IS AMENDED BY THE ADDITION OF THREE NEW SECTIONS to read:

Section 1a. *No presumption in favor of taxing entity.* In matters of tax disputes, both the evidence of the government agency and that of the taxpayer shall be reasonably considered. There shall be no presumption in favor of any government agency either in an administrative determination, judicial proceeding or any appeal therefrom.

Section 18a. *Reform of state and local sales and use taxation.* (1) Notwithstanding any other provision of statute, territorial charter, home rule charter, local ordinance, local resolution, or this constitution to the contrary, the provisions of this section with respect to sales and use taxation

are declared to be matters of statewide concern and statewide interest applicable to all governmental entities of this state and supersede any other provision of this constitution in conflict with these provisions.

(2) The general assembly shall establish by law a uniform statewide system of taxation of retail sales and use transactions which shall include, but not necessarily limited to, the administration, collection, and enforcement of such taxation.

(3) The imposition of taxation upon sales and use shall be upon transactions at retail, and shall not be upon transactions for resale or at wholesale.

(4)(a) The general assembly shall establish a uniform base upon which sales and use taxation is imposed, which base shall be utilized by all governmental entities which levy or impose sales or use taxation without deviation therefrom. For the purposes of this section, the state sales and use tax base in effect on January 1, 1990 shall constitute the uniform statewide base for sales and use taxation until such base is changed in accordance with the provisions of this section.

(b) The provisions of this subsection (4) with regard to the creation of a uniform base for sales and use taxation shall not apply to special purpose taxing bases which were established and in effect on January 1, 1990 for the Colorado tourism promotion fund and the county lodging tax for advertising and marketing of tourism.

(c)(I) The general assembly shall not include services in the uniform statewide base which were not part of the statewide base in effect on January 1, 1990 except by a vote of two-thirds of each house of the general assembly.

(II) This paragraph (c) is repealed July 1, 1997.

(5) The general assembly shall have the sole authority for the determination of exemptions from the sales and use tax in order to adjust the base for equity, fairness, efficiency, or other public purpose, except that food purchased for domestic home consumption shall not be included in the base except as provided in this subsection (5);

(a) No governmental entity shall enact a sales or use tax upon food purchased for domestic home consumption on or after January 1, 1991 unless such food has been made part of the state uniform sales and use tax base, and such inclusion in the base has been submitted to and approved by a vote of the registered electors of the state. For the purposes of this section, "food purchased for domestic home consumption" shall not be defined more restrictively than the definition of "food" used by the federal food stamp program or any successor program thereto.

(b) The provisions of this subsection (5) shall not apply to any governmental entity which had lawfully enacted a sales or use tax upon food purchased for domestic home consumption that was in effect on January 1, 1990. However, any such governmental entity shall apply the tax to food purchased for domestic home consumption only as it is defined in this subsection (5). The provisions of this subsection (5) shall not limit or otherwise affect the rights of the people to seek redress through the process of initiative to determine whether such food shall remain taxable by such governmental entity.

(6)(a) The collection and administration functions of sales and use taxation shall be conducted by the state and, except as provided in paragraph (b) of this subsection, shall be used by all governmental entities granted the authority to levy sales and use taxation. The state shall distribute sales and use tax revenues collected by it and accruing to local governments to the recipient local governments in a timely manner.

(b) The general assembly may authorize local governmental entities that have the authority to impose use taxes to collect, administer, and enforce such taxation at the local level if the general assembly determines that such local oversight would be more cost effective and efficient than use of the state system. However, the base upon which such use taxes are levied shall be established by the general assembly for purposes of uniformity.

(7) The general assembly shall establish procedures for compliance, enforcement and audits to be exercised by the state in behalf of all governmental entities granted authority to levy sales and use taxes, and may provide that such governmental entities may conduct audits of the state agency at their own expense.

(8)(a) The general assembly shall establish a combined rate of taxation which shall be the maximum rate of total sales and use taxes which may, except as hereinafter provided, be levied throughout this state. This provision shall not prohibit the general assembly from approving or establishing rates for the entire state or within or for any specific areas of the state which exceed the maximum rate if the public purpose and special conditions which exist in such areas would warrant such an excess rate.

(b) The general assembly may, subject to approval by the registered electors within a taxing jurisdiction, allow or authorize local governmental entities to levy a local tax rate for either general or special purposes. This paragraph (b) shall not require a reenactment or a reaffirmation vote for any local tax rate which was lawfully enacted and in effect on the effective date of this article. Any local sales or use tax rate which was lawfully in effect on the effective date of this section and which is in excess of the combined rate established by the general assembly shall be considered a nonconforming rate and shall not be required to be reduced in order to comply with the combined rate. However, this provision shall not preclude either the governing body or the registered electors of the governmental entity levying such nonconforming rate from reducing the rate. Nothing in this subsection shall be construed to permit or authorize the automatic increase of any local rate which is less than the combined statewide rate.

(9) No governmental entity shall enact or levy a sales or use tax anywhere within this state except as prescribed by this section. The general assembly shall provide a reasonable transition period for governmental entities which had on January 1, 1990 a lawfully enacted sales or use tax which does not conform with the provisions of this section with respect to use of the uniform state sales and use tax base. Except for the transition period authorized for utilization of the uniform state sales and use tax base, all governmental entities which levy sales and use taxes shall be in compliance with the provisions of this section for administration, compliance and enforcement not later than January 1, 1992, however the general assembly may extend this date for a period not to exceed six months. Not later than January 31, 1993, all sales and use taxes imposed anywhere in this state shall be in conformance with the provisions of this section and with applicable state statutes or they shall be null and void and without effect.

(10) The provisions of this section shall not supersede the provisions of section 18 of article X of this constitution with respect to the imposition and use of excise taxation for the public highways and other transportation purposes.

(11) The revenues accruing to the state from the imposition of sales and use taxation shall be deposited in the general fund and, after meeting the requirements for satisfaction of the old age pension fund and other funds established by article XXIV of this constitution, may be expended in conformance with appropriations made by the general assembly for the lawful purposes of the state.

(12) The application of the provisions of this section shall not act to reduce or impair the amount of any tax or source of revenue which has been pledged for the payment of principal or interest on any lawfully incurred debt by any governmental entity which was outstanding on January 1, 1991 so long as the outstanding indebtedness is not increased in amount or extended as to maturity.

(13)(a) Except where legislative action is directed, this section is in all respects self executing, and such other legislation may be enacted as necessary to facilitate implementation, but no such legislation shall lim-

it or restrict the provisions of this section or the powers herein granted or reserved.

(b) It is the intent of the people in enacting this section that, notwithstanding any other provision of this constitution to the contrary, the provisions of this section are severable, and if any provision of this section is found by a court of competent jurisdiction to be unconstitutional, the remaining provisions of this section are valid.

Section 18b. *Real estate transfer taxes —prohibited.* (1) No governmental entity in this state shall impose a tax upon the transfer of real property. Any governmental entity which had a lawfully enacted transfer tax on real property on January 1, 1990 may continue to levy and collect such tax, but such tax shall always remain subject to repeal by the registered electors of such governmental entity. The provisions of this section shall not apply to any fee payable to a county clerk or recorder for the filing and recording of any document transferring any interest in real property nor any fee payable in connection with furnishing information used for property tax purposes.

(2) The application of the provisions of this section shall not act to reduce or impair the amount of any tax or source of revenue which has been pledged for the payment of principal or interest on any lawfully incurred debt by any governmental entity which was outstanding on January 1, 1991 so long as the outstanding indebtedness is not increased in amount or extended as to maturity.

SECTION 2. *Provisions of measure severable.* It is the intent of the people of this state that notwithstanding any provision of statute or this constitution to the contrary, the provisions of this initiative measure are severable, and if any provision is found to be invalid or unconstitutional by a court of competent jurisdiction, the other provisions are valid.

SECTION 3. This initiative measure shall take effect January 1, 1991.

Submitted by: Ronald D. Smith

National Federation of Independent Business

1391 N. Speer Blvd.

Suite 470

Denver, Colorado 80204

303–534–1631

Richard G. Brown

2951 S. Adams

Denver, Colorado 80210

303–756–5513