In the Matter of the TITLE, BALLOT TITLE AND SUBMISSION CLAUSE, AND SUMMARY FOR A PETITION ON SCHOOL FINANCE.

Douglas Bruce, Petitioner,

and

JoElyn Newcomb and Alexander Brown, Respondents,

and

Natalie Meyer, Rebecca Lennahan, and Stephen ErkenBrack, Title Setting Board.

No. 94SA118.

Supreme Court of Colorado, En Banc.

June 6, 1994.

Justice VOLLACK delivered the Opinion of the Court.

The petitioner Douglas Bruce (Bruce), a registered elector of the State of Colorado, challenges the title, ballot title and submission clause, and summary prepared by the Title Setting Review Board (the Board) for a proposed initiative amendment to the Colorado Constitution concerning school finance pursuant to section 1–40–107(2), 1B C.R.S. (1993 Supp.). The respondents in this case are the proponents of the initiative.[1]

The proposed initiative would amend Article IX of the Colorado Constitution by adding two new sections, Section 17—Operation of Public Schools, and Section 18—Financial Base of Support for Public Schools. The proposed initiative establishes a consistent level of state funding for public schools over the next ten years. The initiative increases actual hours for student-teacher instruction and contact time, and establishes standards for district planning and teacher professional development time. The initiative also sets a minimum level of state funding for preschool, adult education, worker training and youth apprenticeship programs; limits school district spending on administrative services; and mandates minimum school district spending on instructional personnel. The proposed constitutional amendment is provided in appendix 1, and the Board's proposed title, ballot title and submission clause, and summary are provided in appendix 2. We affirm the Board's ruling.

**I.**

Bruce argues that the title, ballot title and submission clause, and summary are misleading and do not fairly express the true meaning and intent of the proposed constitutional amendment. Bruce further asserts that the Board failed to disclose the alleged irrepealability of the initiative during the effective ten-year period; that the initiative may violate several provisions of the United States Constitution and the Colorado Constitution; that the statutory limit on the size and cost of state government is repealed for all purposes and not just school funding; that sec-

Douglas Bruce, pro se.

Kutak Rock, Diana C. Fields, Charles E. Bedford, Denver, for respondents.

Gale A. Norton, Atty. Gen., Stephen K. ErkenBrack, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Merrill Shields, Deputy Atty. Gen., Richard Djokic, First Asst. Atty. Gen., Stephen G. Smith, Asst. Atty. Gen., Regulatory Law Section, Denver, for Title Setting Bd.

1. The proponents of the initiative are JoElyn Newcomb and Alexander Brown.

tion 18(4) of the proposed initiative allegedly conflicts with section 18(6) of the proposed initiative; and that the fiscal impact statement did not include all of the specific financial information provided by the Office of State Planning and Budgeting.[2]

█ The Board is vested with considerable discretion in setting the title, ballot title and submission clause, and summary. *See In re Proposed Initiated Constitutional Amendment Concerning Limited Gaming in Manitou Springs, Fairplay and in Airports,* 826 P.2d 1241, 1245 (Colo.1992). In reviewing determinations by the Board, we will not address the merits of the proposed initiative; instead, we give great deference to the Board's action in exercising its drafting authority. *In re Campaign and Political Finance Initiative,* 830 P.2d 954 (Colo.1992) (citing *In re Proposed Initiative Concerning "State Personnel System",* 691 P.2d 1121, 1125 (Colo.1984)). We will only set aside the Board's action as invalid when the language used by the Board is clearly misleading. *In re Campaign and Political Finance Initiative,* 830 P.2d at 954 (citing *In re Proposed Initiated Constitutional Amendment Concerning Limited Gaming in Manitou Springs, Fairplay and in Airports,* 826 P.2d at 1245). Otherwise, this court will "not interpret the meaning of the proposed language or suggest how it will be applied if adopted by the electorate." *In re Proposed Election Reform Amendment,* 852 P.2d 28, 31–32 (Colo.1993); *In re Workers Comp Initiative,* 850 P.2d 144, 146 (Colo.1993).

Newcomb and Brown submitted their proposed amendment to the Board which fixed the title, ballot title and submission clause, and summary. After the Board's initial hearing, Bruce filed a timely motion for rehearing with the Secretary of State. At the conclusion of the rehearing, the Board accepted some of the modifications proposed by Bruce and set the title, ballot title and submission clause, and summary. Bruce then filed this original proceeding for review of the Board's action. *See* § 1–40–107(2), 1B C.R.S. (1993 Supp.).

## II.

Bruce first argues that the Board had a duty to reveal in the title, ballot title and submission clause, and summary the alleged irrepealability of the initiative during the effective ten-year period. Bruce further asserts that the alleged irrepealability of the proposed initiative conflicts with federal constitutional guarantees of a "republican form of self government."

Section 18(6) of the proposed initiative reads:

Section 24–75–201.1(1)(a), Colorado Revised Statutes, is repealed. Any provision of the Colorado Constitution or statutes currently existing or hereafter enacted that limits the collection and spending of revenues by the state or by public school districts shall not be applicable to the appropriation and payment by the general assembly of the amounts specified in this section or to the receipt and spending of such amounts by public school districts, and shall be superseded hereby.

█ The Board need not consider and resolve potential or theoretical disputes or determine the meaning or application of the proposed amendment. Neither does the Board have a duty to include in the summary the effect that the proposed initiative may have on other constitutional and statutory provisions. *In re Proposed Election Reform Amendment,* 852 P.2d at 33. The Board's duty is merely to summarize the central features of the initiated measure in the title, ballot title and submission clause, and summary in a clear and concise manner. *Id.* at 32.

█ Our review of the Board's action is limited to whether the title, ballot title and submission clause, and summary fairly reflect the intent of the initiative so that petition signers and voters will not be misled into support for or against a proposition by reason of the words employed by the Board. *In re Workers Comp Initiative,* 850 P.2d at 146.

█ Section 18(6) does not state anywhere that the proposed new sections 17 and 18 are

---

**2.** Bruce advances several additional issues that speak to his opposition to the proposed initiative

and that are related to the arguments discussed *supra.* We find no merit in these claims.

"irrepealable." Rather, it states that, for a ten-year period, any conflicts between the measure and subsequent constitutional or statutory measures should be resolved in favor of the proposed initiative.

Bruce fails to provide any evidence of an intent by the proponents of the present proposal to effect an irrepealability clause.[3] The only evidence cited by Bruce to show such an intent is a telephone conversation in which Newcomb allegedly admitted to Bruce that irrepealability was the intent.

We reject Bruce's initial challenge to the title, ballot title and submission clause, and summary, as fixed by the Board.

### III.

■ Bruce additionally contends that the initiative may violate Articles IV, V, and VI of the United States Constitution, and Articles II, V, X, and XIX of the Colorado Constitution, which allegedly should have been disclosed by the Board.

Bruce's constitutional challenge to the initiative is beyond the scope of this court's review of the Board's decisions in setting the title, ballot title and submission clause, and summary, and therefore we need not address it. *See In re Proposed Election Reform Amendment*, 852 P.2d at 33 n. 2.

### IV.

■ Bruce claims that the fiscal impact statement contained in the summary is inadequate because the Board failed to include all of the specific financial information provided by the Office of State Planning and Budgeting (OSPB). Bruce maintains that the "enormous budgetary impact" of the proposed initiative should be disclosed in the ballot title and submission clause as allegedly required by the Colorado Constitution, Article X, Sections 20(3)(c) and (7)(d). Bruce further contends that the fiscal impact statement is not sufficiently detailed in the figures presented.

The Board adopted the following fiscal statement:

The fiscal impact of this measure on school districts is indeterminate until school districts adopt their 1995–96 budgets. Officials of state government believe that this measure will have no fiscal impact on local governments other than school districts. Based on the minimum state share of support requirements and the provisions concerning school district property tax revenues, this measure is expected to have a fiscal impact on the state beginning in fiscal year 1996 of approximately $221,021,269. This fiscal impact is expected to increase each year until the repeal of the measure and will have reached approximately $497,660,776 in fiscal year 1999.

There may be additional fiscal impact due to the requirement that school districts not lose revenue as a result of tax abatements, refunds or credits.

The Board received assistance from both OSPB and the Department of Local Affairs (DLA) in preparing the fiscal impact statement. OSPB identified a number of specific fiscal impacts in the proposal. These impacts involve costs to local school districts under the general provisions of the measure. The OSPB estimated that, by fiscal year 1999, the state government will be required to provide $497 million in state aid to local school districts. Although the OSPB identified these impacts, its summary clearly states that its figures regarding local school districts are estimates dependent on adoption of their fiscal year 1995–96 budgets.

■ The purpose of including a fiscal impact statement in the summary is to inform the electorate of the fiscal implications of the proposed measure. *In re Proposed Initiative for an Amendment Entitled "W.A.T.E.R."*, 831 P.2d 1301, 1306 (Colo. 1992); *Citizens for Free Enterprise v. Department of Revenue*, 649 P.2d 1054, 1060 (Colo.1982). The Board has discretion in exercising its judgment regarding how to best communicate that a proposed measure will have a fiscal impact on government without creating prejudice for or against the proposed measure. A separate explanation of

---

**3.** We note that Bruce's argument is based upon his interpretation of the proposed initiative. The plain language of the proposed initiative does not

attempt to curb the people's right to enact a later amendment repealing its provisions.

the fiscal impact of a measure is not required when the fiscal impact cannot be determined due to the variables involved. *In re Proposed Initiative Under the Designation "Tax Reform"*, 797 P.2d 1283, 1291 (Colo.1990).

The Board's description of the fiscal impact of the amendment accurately reflects the information provided by the OSPB and the DLA, and is supported by the record. The OSPB calculated a single yearly impact on the state budget because there is only one quantifiable impact caused by the initiative, namely, that the state shall be required to increase its yearly aid to school districts. The DLA found that the initiative would have no fiscal impact on local government other than school districts. The Board's fiscal summary states this conclusion. The fiscal impact summary clearly informs voters that the impact on state government is significant and expected to rise over time.

We conclude that the Board correctly decided that fiscal impact projections beyond fiscal year 1998–1999 are indeterminate given that numerous variables frustrate any effort to reasonably determine the fiscal impact. *In re Proposed Election Reform Amendment*, 852 P.2d at 37. Further, the fiscal impact statement clearly and accurately reflects the information provided by the OSPB and DLA.

## V.

■ Bruce next asserts that the title, ballot title and submission clause, and summary, in indicating a repeal of "the statutory limitation on increases in state general fund appropriations," is not sufficient because it fails to mention a repeal of the "5% of Colorado personal income" provision in the statute. Bruce argues that the Board erred by not fully describing the effects the amendment might have or how a court might interpret the amendment.

The Board disclosed in the title, ballot title and submission clause, and summary that the school finance amendment would "repeal the

statutory limitation on increases in state general fund appropriations." [4]

■ The Board is given discretion in resolving the interrelated problems of length, complexity, and clarity in designating a title and a ballot title and submission clause. *In re Proposed Initiative Concerning "State Personnel System"*, 691 P.2d 1121, 1125 (Colo.1984). The Board's duty is merely to summarize the central features, and not every feature, of the proposed initiative measure in drafting a title or ballot title and submission clause in a clear and concise manner. *See In re Proposed Initiated Constitutional Amendment Concerning Limited Gaming in the City of Antonito (Limited Gaming IV)*, 873 P.2d 733, 739 (Colo.1994); *In re Proposed Election Reform Amendment*, 852 P.2d at 32–33. The Board is not required to explain the meaning or potential effects of the proposed initiative on the present statutory scheme in the summary. *See In re Proposed Initiative on Surface Mining*, 797 P.2d 1275, 1279 (Colo.1990).

■ The construction of the language of a proposed initiative is beyond the scope of a statutory review proceeding. *In re Proposed Initiative on Surface Mining*, 797 P.2d at 1279.

The title, ballot title and submission clause, and summary accurately reflect the repeal of section 24–75–201.1(1)(a)'s limit on increases in state general fund appropriations. We find no abuse of discretion in the Board's election not to disclose a repeal of the "5% of Colorado personal income" provision. Once again, we conclude that the title, ballot title and submission clause, and summary are neither unfair nor misleading.

## VI.

■ Bruce finally asserts that, since section 18(4) and section 18(6) are internally conflicting, the Board was required to indicate the internal conflict in the title, ballot title and submission clause, and summary.

---

**4.** Section 24–75–201.1(1)(a) provides for restrictions on state general fund appropriations, using "5% of Colorado personal income" or "6% over the total state general fund appropriations for the previous fiscal year" as standards for limiting the "total state general fund appropriations for a year."

Section 18(4) provides a mechanism to reduce school finance appropriations on a year-to-year basis and acts as an exception to the prohibition in section 18(6). This exception is not a statute or constitutional provision either existing at the time of adoption of the initiative or enacted after the adoption of the initiative. It is adopted as part of the initiative.

 Two conflicting amendments can be proposed or even adopted at the same election. *See In re Interrogatories Propounded by the Senate Concerning House .Bill 1078*, 189 Colo. 1, 536 P.2d 308 (1975).

The Board disclosed both provisions in the title and submission clause and was not required to interpret their meaning or suggest whether they would conflict when applied. Accordingly, we reject Bruce's claim that the Board erred in not specifying in the ballot title and submission clause that section 18(4) and section 18(6) of the proposed amendment are internally conflicting.

## VII.

We conclude that the title, ballot title and submission clause, and summary adopted by the Board clearly, fairly, and accurately express the primary features and the true intention and purpose behind the "Initiative for a Bright Future." We also hold that the title, ballot title and submission clause, and summary need not include a reference to the fact that the initiative may be determined to conflict with a separate proposed initiative selected for the same election. We affirm the title, ballot title and submission clause, and summary adopted by the Board.

## APPENDIX 1

## INITIATIVE FOR A BRIGHT FUTURE

Be it enacted by the people of the State of Colorado:

Article IX of the Constitution of the State of Colorado is amended by the addition of the following new sections to read:

**Section 17. Operation of Public Schools.**

(1) *Teacher–Student Instruction and Contact Time.* By the 1996–97 school year, the *minimum* actual hours of teacher-student instruction and teacher-student contact during the school year shall be increased by a total of twenty percent over such *minimum* actual hours required for the 1993–1994 school year, as follows: (a) for the 1995–96 school year, no less than 1,162 hours for secondary school students, no less than 1,065 hours for elementary school students and no less than 479 hours for kindergarten students, and (b) for the 1996–97 school year and each school year thereafter, no less than 1,267 hours for secondary school students, no less than 1,162 hours for elementary school students and no less than 522 hours for kindergarten students. The number of hours required by this subsection shall include, in each case, closings deemed by the local board of education to be necessary for the health, safety, or welfare of the students.

(2) *Business Tax Credit.* Beginning January 1, 1996, a credit with respect to income taxes imposed by the state shall be allowed to any business that facilitates school-to-work opportunities, including, but not limited to, adult literacy, mentoring or youth apprenticeship programs, or that permits a significant number of its Colorado employees to volunteer in a classroom of any public school district at least two days per calendar year that such employees would normally spend in the employ of the business. On or before December 31, 1995, the general assembly shall adopt legislation implementing this subsection.

(3) *Reports on the Status of Public* Education. (a) On the second Monday in September of each year, the governor and the commissioner of education shall jointly report to the citizens of Colorado on the status of public education. Such report shall include, but not be limited to, information on progress towards attainment of state education goals and national education goals, an overview of any recently passed legislation that affects education policy, and the status of school finance in the State of Colorado.

(b) Any report that is required by the Public School Finance Act of 1988 or any successor statute to be submitted by a local board of education to the state board of education, concerning the achievement by the district of its educational goals and objectives, shall be submitted on or before July 31 of each year. In addition, any board of education report to the community that is required in the rules for the accreditation of school districts shall be submitted to the community on the second Monday in September of each year.

(4) *Increasing Funding for Preschool and Other Programs.* For the purpose of funding preschool, adult literacy, worker training and youth apprenticeship programs, the general assembly shall appropriate and pay the following: (a) for the 1995–96 and 1996–97 school-district fiscal years, an amount not less than one percent of the amount calculated under Section 18(2) of this article before the reductions for property tax revenues and specific ownership taxes prescribed by (a) and (b) of Section 18(2) of this article, and (b) for the 1997–98 school district fiscal year and each fiscal year thereafter, an amount not less than two percent of the amount calculated under Section 18(2) of this article before the reductions for property tax revenues and specific ownership taxes prescribed by (a) and (b) of Section 18(2) of this article. Amounts required to be appropriated and paid under this subsection shall be in addition to amounts required to be appropriated and paid under Section 18(2) of this article.

(5) *Student, Parent, and School District Annual Plan.*

(a) Upon enrollment of a student for the 1995–96 school year and each school year thereafter, each school district shall develop a written plan with each student and with the student's parent or legal guardian, which plan shall be signed by the student and the student's parent or legal guardian. Each plan shall address the responsibility of the school district to provide an educational program and hours of instruction, the responsibility of the student and each student's parent or legal guardian to adhere to the requirements of the school district's discipline and attendance policies and the responsibility of the student to be in school prepared to learn. Each plan may contain such other provisions as the local board of education shall deem necessary. Plans may be uniform throughout a school district or may vary among schools and among students within a school district as the local board of education shall deem necessary.

(b) Representative plans shall be included in the reports required to be submitted by local boards of education pursuant to paragraph (b) of subsection 3 of this section.

(6) *Teacher Professional Development Time.* For the 1995–96 school year and each school year thereafter, each board of education shall require no less than twelve days of professional development, parent-teacher conferences, training and collaborative planning for each teacher employed by the school district. These activities shall be district-directed in collaboration with instructional personnel and school-focused, and shall support the educational goals and objectives of the state and the school district. The twelve days required by this subsection shall be in addition to the days and hours required by subsection 1 of this section. At least five days of the twelve days required by this subsection shall be scheduled and held prior to commencement of classes.

(7) *Administrative Spending Limitations.* (a) The budget adopted for the 1995–96 school district fiscal year and each school district fiscal year thereafter by the board of education for each school district with a student enrollment greater than 500 in the preceding school district fiscal year shall provide for an amount to be spent on the salaries and benefits of administrators that does not exceed nine percent of the total amount budgeted to be spent from the school district's general fund. "Administrators" means superintendents, assistant superintendents, principals, assistant principals, directors, managers, supervisors, attendance officers, deans and administrative assistants. For purposes of this subsection, "student enrollment" shall have the same meaning as in Section 18(1)(c) of this article.

(b) Salaries and benefits for administrators shall be reported to the commissioner of

education within 110 days after the beginning of each school district fiscal year. For the 1998–99 school district fiscal year and each fiscal year thereafter, the general assembly may revise, by passage of a bill, but may not eliminate, the standards established by this subsection. Upon a showing of good cause, the commissioner of education annually may approve an increase in the percent to be spent on the salaries and benefits of administrators by a school district for that fiscal year.

(8) This section shall supersede any conflicting provision of the state constitution and shall supersede any conflicting provision of state statutes.

(9) If any provision of this section shall be held or deemed to be or shall, in fact, be illegal, inoperative or unenforceable, the same shall not affect any other provision or provisions contained in this section or render the same invalid, inoperative or unenforceable to any extent whatever.

(10) This section is effective on January 1, 1995, and is repealed on July 1, 2005.

### Section 18. Financial base of support for public schools.

(1) As used in this section:

(a) "Financial base of support per student" means the sum of the amount of the total equalization program funding calculated for all school districts for the 1993–1994 fiscal year under the "Public School Finance Act of 1988" plus the amount of increased enrollment funding and plus specific ownership taxes received by all school districts during the 1993–94 fiscal year that were attributable to the mill levy imposed for equalization program funding under the Public School Finance Act of 1988, divided by the number of students enrolled in all public school districts statewide during October 1993. Total equalization program funding shall not include unequalized revenues.

(b) "Inflation" means the percentage change in the United States Bureau of Labor Statistics Consumer Price Index for the Denver–Boulder metropolitan statistical area, all items, all urban consumers, or any successor index.

(c) "Student enrollment" means the total number of students, determined on October 1 of each year or on the school day nearest that date, who are enrolled in preschool through twelfth grade in public school districts.

(d) "Unequalized revenues" means revenues for all school districts from taxes levied to pay debt service on general obligation bonds, taxes levied pursuant to any law of the state which authorizes school districts to raise and expend local property tax revenues for capital improvements, transportation, or complying with federal mandates concerning asbestos and hazardous materials removal and with the federal Americans With Disabilities Act of 1990, taxes levied to recover tax abatements, refunds or credits or taxes levied for programs described in subsection (3)(a) of this section.

(e) "Increased enrollment funding" means the additional state support received by school districts pursuant to section 22–53–116, Colorado Revised Statutes.

(2) For the 1995–96 school district fiscal year and each school district fiscal year thereafter, the general assembly shall appropriate and pay each year to all public school districts an amount not less than the financial base of support per student as adjusted for inflation from and including the calendar year 1993 on a cumulative basis, multiplied by student enrollment projected for the school district fiscal year beginning on the immediately following July 1, and less (a) the amount projected to be actually received by all school districts during the school district fiscal year from the property tax revenues authorized for equalization program funding under the Public School Finance Act of 1988 or any successor statute, and (b) the amount of specific ownership taxes projected to be actually received by all school districts during such school district fiscal year that are attributable to any mill levy imposed for equalization program funding under the Public School Finance Act of 1988 or any successor statute. Unequalized revenues shall not be included for purposes of determining the amount to be appropriated and paid each

year to all public school districts pursuant to the preceding sentence. Student enrollment shall be projected for the school district fiscal year beginning on the immediately following July 1, and the actual student enrollment shall increase, and may decrease, the amount calculated pursuant to the first sentence of this subsection. The general assembly shall enact legislation no later than June 30, 1995 to provide that school districts will not lose revenue as a result of tax abatements, refunds or credits. For each of the 1995–96 and 1996–97 school district fiscal years, each school district shall spend on instructional personnel: (a) the amounts spent on instructional personnel during the prior school district fiscal year, plus (b) from the increased revenues received pursuant to the application of this section, an amount in the same proportion, plus at least ten percent, as the amount spent on instructional personnel during the prior school district fiscal year.

(3) The amount of any increase in the amount that is to be appropriated and paid by the general assembly pursuant to the provisions of subsection (2) of this section shall not be funded through (a) a reduction by the general assembly in total moneys provided or distributed from any sources by the state for other public school programs funded during the 1993–94 school district fiscal year, including, but not limited to, transportation aid, special education aid, vocational education aid and funding under the English Language Proficiency Act, (b) local property taxes that are levied, with local voter approval and for purposes other than capital improvements, in excess of or unrelated to equalization program funding, or (c) federal or state categorical grants or private grants.

(4) The general assembly may, by a vote of two-thirds of the members of each house, decrease the amount to be appropriated and paid by the general assembly pursuant to subsection (2) of this section. Any decrease pursuant to this subsection shall not be cumulative, and shall not serve to reduce the amount to be appropriated and paid by the general assembly pursuant to the provisions

of subsection (2) of this section for the next school district fiscal year.

(5) This section shall not be construed to establish a financial base of support per student for any particular school district.

(6) Section 24–75–201.1(1)(a), Colorado Revised Statutes, is repealed. Any provision of the Colorado Constitution or statutes currently existing or hereafter enacted that limits the collection and spending of revenues by the state or by public school districts shall not be applicable to the appropriation and payment by the general assembly of the amounts specified in this section or to the receipt and spending of such amounts by public school districts, and shall be superseded hereby.

(7) If any provision of this section shall be held or deemed to be or shall, in fact, be illegal, inoperative or unenforceable, the same shall not affect any other provision or provisions contained in this section or render the same invalid, inoperative or unenforceable to any extent whatever.

(8) This section is effective on January 1, 1995, and is repealed on July 1, 2005.

APPENDIX 2

Proposed Initiative on School Finance

The title as designated and fixed by the Board is as follows:

AN AMENDMENT TO THE COLORADO CONSTITUTION TO INCREASE THE MINIMUM HOURS OF PUBLIC SCHOOL TEACHER–STUDENT INSTRUCTION AND CONTACT; TO REQUIRE AN INCOME TAX CREDIT FOR BUSINESSES THAT FACILITATE SCHOOL–TO–WORK OPPORTUNITIES; TO PROVIDE A MINIMUM LEVEL OF STATE FUNDING FOR PRESCHOOL, ADULT LITERACY AND WORKER TRAINING PROGRAMS; TO REQUIRE SCHOOL DISTRICTS, WITH STUDENTS AND THEIR PARENTS OR GUARDIANS, TO DEVELOP WRITTEN PLANS FOR EACH STUDENT; TO SET PROFESSIONAL DEVELOPMENT TIME FOR TEACHERS; TO LIMIT EXPENDITURES FOR ADMINISTRATOR SALARIES AND BENE-

FITS IN SCHOOL DISTRICTS WITH OVER 500 STUDENTS; TO REQUIRE A MINIMUM LEVEL OF STATE APPROPRIATIONS FOR SCHOOL FINANCE BEGINNING IN 1995–96, BASED ON THE 1993–94 FINANCIAL SUPPORT PER STUDENT, ADJUSTED FOR INFLATION; TO EXCLUDE CERTAIN SCHOOL DISTRICT PROPERTY TAX AND SPECIFIC OWNERSHIP TAX REVENUES FROM THE AMOUNT REQUIRED TO BE APPROPRIATED; FOR THE NEXT TWO YEARS, TO REQUIRE SCHOOL DISTRICTS TO SPEND A PROPORTION OF THE NEW REVENUE RECEIVED PURSUANT TO THIS MEASURE ON TEACHERS; TO PREVENT LOSS OF SCHOOL DISTRICT REVENUE AS A RESULT OF TAX ABATEMENTS, REFUNDS, OR CREDITS; TO PROHIBIT FUNDING OF THIS MEASURE BY REDUCING THE FUNDING FOR PUBLIC SCHOOLS FROM OTHER SOURCES OR PUBLIC SCHOOL PROGRAMS; TO ALLOW THE GENERAL ASSEMBLY TO APPROPRIATE LESS THAN THE AMOUNT REQUIRED FOR SCHOOL FINANCE ONLY BY A TWO–THIRDS VOTE; TO REPEAL THE STATUTORY LIMITATION ON INCREASES IN STATE GENERAL FUND APPROPRIATIONS; TO PROVIDE THAT STATE AND LOCAL REVENUE AND SPENDING LIMITS DO NOT APPLY TO SCHOOL FINANCE MONEYS REQUIRED BY THE MEASURE; AND TO PROVIDE THAT THE MEASURE WILL TAKE EFFECT ON JANUARY 1, 1995 AND WILL BE REPEALED ON JULY 1, 2005.

The ballot title and submission clause as designated and fixed by the Board is as follows:

SHALL THERE BE AN AMENDMENT TO THE COLORADO CONSTITUTION TO INCREASE THE MINIMUM HOURS OF PUBLIC SCHOOL TEACHER–STUDENT INSTRUCTION AND CONTACT; TO REQUIRE AN INCOME TAX CREDIT FOR BUSINESSES THAT FACILITATE SCHOOL–TO–WORK OPPORTUNITIES; TO PROVIDE A MINIMUM LEVEL OF STATE FUNDING FOR PRESCHOOL, ADULT LITERACY AND WORKER TRAINING PROGRAMS; TO REQUIRE SCHOOL DISTRICTS, WITH STUDENTS AND THEIR PARENTS OR GUARDIANS, TO DEVELOP WRITTEN PLANS FOR EACH STUDENT; TO SET PROFESSIONAL DEVELOPMENT TIME FOR TEACHERS; TO LIMIT EXPENDITURES FOR ADMINISTRATOR SALARIES AND BENEFITS IN SCHOOL DISTRICTS WITH OVER 500 STUDENTS; TO REQUIRE A MINIMUM LEVEL OF STATE APPROPRIATIONS FOR SCHOOL FINANCE BEGINNING IN 1995–96, BASED ON THE 1993–94 FINANCIAL SUPPORT PER STUDENT, ADJUSTED FOR INFLATION; TO EXCLUDE CERTAIN SCHOOL DISTRICT PROPERTY TAX AND SPECIFIC OWNERSHIP TAX REVENUES FROM THE AMOUNT REQUIRED TO BE APPROPRIATED; FOR THE NEXT TWO YEARS, TO REQUIRE SCHOOL DISTRICTS TO SPEND A PROPORTION OF THE NEW REVENUE RECEIVED PURSUANT TO THIS MEASURE ON TEACHERS; TO PREVENT LOSS OF SCHOOL DISTRICT REVENUE AS A RESULT OF TAX ABATEMENTS, REFUNDS, OR CREDITS; TO PROHIBIT FUNDING OF THIS MEASURE BY REDUCING THE FUNDING FOR PUBLIC SCHOOLS FROM OTHER SOURCES OR PUBLIC SCHOOL PROGRAMS; TO ALLOW THE GENERAL ASSEMBLY TO APPROPRIATE LESS THAN THE AMOUNT REQUIRED FOR SCHOOL FINANCE ONLY BY A TWO–THIRDS VOTE; TO REPEAL THE STATUTORY LIMITATION ON INCREASES IN STATE GENERAL FUND APPROPRIATIONS; TO PROVIDE THAT STATE AND LOCAL REVENUE AND SPENDING LIMITS DO NOT APPLY TO SCHOOL FINANCE MONEYS REQUIRED BY THE MEASURE; AND TO PROVIDE THAT THE MEASURE WILL TAKE EFFECT ON JANUARY 1, 1995 AND WILL BE REPEALED ON JULY 1, 2005?

The summary as prepared by the Board is as follows:

This measure increases the required minimum number of hours for public school

teacher-student instruction and contact by a total of twenty percent by 1996–97. It provides for a state income tax credit beginning January 1, 1996, to businesses that facilitate school-to-work opportunities. The measure requires the governor and the commissioner of education to report jointly each year to the citizens on the status of public education in Colorado.

The measure requires the General Assembly to appropriate an amount for preschool, adult literacy, worker training, and youth apprenticeship programs equal to not less than one percent of the total appropriation to school districts for the 1995–96 and 1996–97 fiscal years, and not less than two percent in subsequent years.

The measure directs school districts, beginning with the 1995–96 school year, to develop written plans with each student and with the student's parent or legal guardian, addressing the responsibilities of the district, the student and the student's parent or guardian.

Beginning with the 1995–96 school year, the measure directs each board of education to require at least twelve days of district-directed and school-focused professional development, parent-teacher conferences, training, and collaborative planning for each teacher. The twelve days are to be in addition to the required hours of teacher-student instruction and contact, with at least five of the twelve days scheduled prior to commencement of the district's classes.

In school districts having a student enrollment of greater than 500 students in the preceding year, the measure requires that the amount budgeted for administrator salaries and benefits in the 1995–96 fiscal year and thereafter not exceed 9 percent of the school district's budgeted general fund expenditures.

The measure establishes a formula for determining the minimum amount to be appropriated and paid to school districts each year, beginning with the 1995–96 school district fiscal year.

The measure requires the General Assembly to enact legislation by June 30, 1995, to provide that school districts shall not lose revenue from tax abatements, refunds or credits. For the 1995–96 and 1996–97 school district fiscal years, the measure also requires that any increase in revenue be spent on teachers in the same proportion as the amount spent in the previous year plus ten percent.

The measure provides that any increases in the minimum amount to be appropriated and paid as a result of the measure shall not be funded through reductions in the total amount spent on other public school programs during the 1993–94 fiscal year, through voter-approved local property taxes levied for purposes other than capital improvements and which are in excess of or unrelated to equalization program funding, or through federal or state categorical grants or private grants.

The measure allows the General Assembly, by a two-thirds vote of each house, to decrease the minimum amount to be appropriated and paid in any year. The decrease is not to be cumulative nor used to reduce the minimum amount to be appropriated and paid in the following school district fiscal year. The measure shall not establish a financial base of support per student for any particular school district.

The measure repeals the statutory limit on increases in state general fund appropriations.

The measure would supersede conflicting provisions of the state constitution and statutes. The measure takes effect January 1, 1995, and will be repealed July 1, 2005.

The fiscal impact of this measure on school districts is indeterminate until school districts adopt their 1995–96 budgets. Officials of state government believe that this measure will have no fiscal impact on local governments other than school districts. Based on the minimum state share of support requirements and the provisions concerning school district property tax revenues, this measure is expected to have a fiscal impact on the state beginning in fiscal year 1996 of approximately $221,021,269. This fiscal impact is expected to increase each year until the repeal of the measure and will have

reached approximately $497,660,776 in fiscal year 1999.

There may be additional fiscal impact due to the requirement that school districts not lose revenue as a result of tax abatements, refunds or credits.

3/16/94 Rehearing

Adjourned 5:58 p.m.