**In the Matter of the TITLE, BALLOT TITLE AND SUBMISSION CLAUSE, AND SUMMARY APPROVED FEBRUARY 12, 1992, With Regard to the Proposed Initiated Constitutional Amendment Concerning Limited Gaming in the Town of Idaho Springs.**

**James E. Klodzinski, Charles R. Sarner, and Wendell Upright, Petitioners,**

**and**

**Art Rosean and Kelly Seymour, Respondents,**

**and**

**Ray Slaughter, Doug Brown and Natalie Meyer, Title Setting Board.**

**No. 92SA96.**

Supreme Court of Colorado, En Banc.

May 26, 1992.

Rehearing Denied June 8, 1992.

James E. Klodzinski, pro se.

Charles R. Sarner, pro se.

F. Brittin Clayton, III, Eldorado Springs, for Wendell Upright.

Joseph Stern, Denver, for respondents.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., and Maurice G. Knaizer, Deputy Atty. Gen., Denver, for Title Setting Bd.

Justice KIRSHBAUM delivered the Opinion of the Court.

Petitioners, James E. Klodzinski, Charles R. Sarner and Wendell Upright, have filed this statutory challenge to the title, ballot title and submission clause and summary prepared by the Initiative Title Setting Review Board (the Board) for a proposed initiative to amend the Colorado Constitution with respect to limited gaming.[1] Klodzinski and Sarner assert that the Board had no authority to prepare the documents. Upright contends that the title, ballot title and submission clause and summary are misleading and fail to express clearly the true meaning of the proposed amendment. We conclude that the Board lacked authority to fix the title, ballot title and submission clause and summary to the proposal in the circumstances of this case and that those documents are impermissibly mis-

---

1. This proceeding was filed pursuant to § 1–40– 102(3)(a), 1B C.R.S. (1991 Supp.).

leading. We therefore reverse and remand the matter to the Board with directions.

### I

As proposed, the amendment, which pertains to limited gaming, will add a new section consisting of three subsections to article XVIII of the Colorado Constitution.[2] The first subsection authorizes limited gaming in the city of Idaho Springs, Colorado, as of January 1, 1993. The second subsection specifies regulations governing the limited gaming authorized by the amendment and establishes a program to tax gross proceeds of licensees for the benefit of various city of Idaho Springs and Clear Creek County programs. The third subsection states as follows:

3) This section shall be deemed not to have been adopted contemporaneously with any amendment to any other section of this article which permits limited gaming, and, except for subsection 2(a), this section shall not affect, nor shall it be affected by, any other such section.

The title prepared by the Board states as follows:

AN AMENDMENT TO ARTICLE XVIII OF THE COLORADO CONSTITUTION TO PERMIT LIMITED GAMING IN THE CITY OF IDAHO SPRINGS; TO ALLOW THE LIMITED GAMING CONTROL COMMISSION TO APPROVE, STATEWIDE, ANY CASINO GAMES AND TO ESTABLISH A STATEWIDE MAXIMUM WAGER OF AT LEAST FIVE DOLLARS; AND TO SET FORTH CERTAIN BUILDING RESTRICTIONS AND TO ADD TAX REVENUE ALLOCATIONS FOR LIMITED GAMING IN IDAHO SPRINGS AND CLEAR CREEK COUNTY.

The ballot title and submission clause prepared by the Board states as follows:

SHALL THERE BE AN AMENDMENT TO ARTICLE XVIII OF THE COLORADO CONSTITUTION TO PERMIT LIMITED GAMING IN THE CITY OF IDAHO SPRINGS; TO ALLOW THE LIMITED GAMING CONTROL COMMISSION TO APPROVE, STATEWIDE, ANY CASINO GAMES AND TO ESTABLISH A STATEWIDE MAXIMUM WAGER OF AT LEAST FIVE DOLLARS; AND TO SET FORTH CERTAIN BUILDING RESTRICTIONS AND TO ADD TAX REVENUE ALLOCATIONS FOR LIMITED GAMING IN IDAHO SPRINGS AND CLEAR CREEK COUNTY?·

The summary prepared by the Board states in pertinent part as follows:

This measure authorizes limited gaming in Idaho Springs as of January 1, 1993, without local approval or ordinances. The limited gaming control commission is allowed to approve, statewide, any casino games and to establish a statewide maximum wager of at least five dollars. Floor-area specifications on buildings licensed for limited gaming and a presumption of good moral character on the part of certain applicants for gaming licenses differ from the existing constitutional limitations on gaming in Central City, Black Hawk, and Cripple Creek. The measure also specifies how tax revenues from limited gaming in Idaho Springs shall be spent, with the city of Idaho Springs and Clear Creek County receiving distributions from the existing limited gaming fund in the same manner and proportion as are made for other limited gaming communities plus an additional 7½% to Clear Creek County and 1¾% to Idaho Springs from a newly created local limited gaming fund financed by additional taxes on licensees....[3]

### II

On January 7, 1992, the proponents of the proposed amendment, Art Rosean and Kelly Seymour, filed an initial draft version thereof with the Office of Legislative Legal Services and the Legislative Council (herein termed the legislative offices), pursuant to section 1–40–101(1), 1B C.R.S. (1991 Supp.).

---

2. The text of the proposed amendment is set forth in full as APPENDIX A to this opinion.

3. The summary also contains a fiscal impact statement, the contents of which are not challenged in this appeal.

The initial draft was amended on January 13, 1992, and the amended document (the January 13 document) was the subject of a public meeting conducted on January 16, 1992, pursuant to section 1–40–101(1),[4] during which representatives of the legislative offices commented upon the proposal.

On January 28, 1992, the proponents filed the proposed amendment with the Colorado Secretary of State (the Secretary), pursuant to section 1–40–101(2), 1B C.R.S. (1991 Supp.), and requested the Board to fix the title thereto. The contents of the proposed amendment differ in several respects from the contents of the January 13 document. At a public meeting conducted on February 12, 1992, pursuant to section 1–40–101(2), the Board prepared the title, ballot title and submission clause and summary for the proposed amendment. Although the record indicates that the Board had prepared draft proposals of the ballot title documents prior to the February 12 meeting, the record on appeal does not contain copies of those draft proposals.

Petitioners Klodzinski and Sarner timely filed motions for rehearing pursuant to section 1–40–102(3)(a), 1B C.R.S. (1991 Supp.), alleging that the proposed amendment in effect constituted a new proposal that must be submitted to the legislative offices for review and comment before the Board was authorized to fix the title thereto. Petitioner Upright also filed a motion for rehearing, asserting that the title, ballot title and submission clause and summary fixed by the Board did not reflect the true meaning of the proposed amendment. On February 28, 1992, after conducting a hearing pursuant to section 1–40–102(3)(a), the Secretary denied the motions.

### III

■ Several basic principles govern our review of final determinations of the Board. This court's primary function is to ensure that the documents prepared by the Board fairly, accurately and concisely reflect the central features of the initiated measure. *In re Title, Ballot Title and Submission Clause Approved Sept. 4,*

4. The text of the January 13 document is set

*1991,* 826 P.2d 1241, 1245 (Colo.1992), (hereinafter *In re Limited Gaming in Manitou Springs, et al.); In re Proposed Initiated Constitutional Amendment on Education,* 682 P.2d 480, 482 (Colo.1984). We may not consider the merits of the proposed amendment, *Bauch v. Anderson,* 178 Colo. 308, 310, 497 P.2d 698, 699 (1972), and must indulge every legitimate presumption in favor of the Board's action. *Id.; see also In re Limited Gaming in Manitou Springs, et al.,* 826 P.2d at 1245. However, in fixing titles the Board must consider "the public confusion that might be caused by misleading titles" and, "whenever practicable, avoid titles for which the general understanding of the effect of a 'yes' or 'no' vote will be unclear." § 1–40–101(2), 1B C.R.S. (1991 Supp.).

### IV

■ Petitioners Klodzinski and Sarner contend that the language of subsections 2(a) and 3 of the proposed amendment differs so substantially from the language of the corresponding subsections contained in the January 13 document that the proposed amendment in effect constitutes a new proposal requiring resubmission to the legislative offices and the convening of a public meeting pursuant to section 1–40–101(1), 1B C.R.S. (1991 Supp.). We agree.

Article V, section 1(5), of the Colorado Constitution and section 1–40–101(1) require that a proposed initiative be presented to the legislative offices for comment and discussion at a public meeting prior to the fixing of any ballot title. This requirement permits proponents of initiatives to benefit from the experience of independent experts in the important process of drafting language that may become part of this state's constitutional or statutory jurisprudence. The requirement also permits the public to understand the implication of a proposed constitutional amendment at an early stage of the initiative process. *In re Title, Ballot Title and Submission Clause, and Summary Adopted May 16, 1990,* 797 P.2d 1283, 1287 (Colo.1990) (hereforth as APPENDIX B to this opinion.

inafter *In re Tax Reform*). In the absence of such initial public meeting, the Board has no authority to fix a title to a proposed amendment. *Id.* at 1288.

Subsections 2(a), 2(b) and 3 of the January 13 document state as follows:

2) Limited gaming authorized by this ·section shall be subject to all regulations promulgated by any commission or other such body created by the general assembly for this or a similar purpose, with the following exceptions:

(a) Any casino games may be approved by the commission or other such body;

(b) The maximum wager, which shall not be less than five dollars, shall be established by the commission or other such body;

. . . .

3) This section shall not affect limited gaming permitted by any other section of this article; however, no form of limited gaming may be expanded to other areas within the state except by the initiative process pursuant to section 1 of Article V of this constitution.

The corresponding subsections of the proposed amendment state as follows:

2) Limited gaming authorized by this section shall be subject to all regulations promulgated by any commission or other such body created by the general assem-

bly for this or a similar purpose, with the following exceptions:

(a) The commission or other such body shall have the authority to approve any casino games and establish the maximum wager, which shall not be less than five dollars;

. . . .

3) This section shall be deemed not to have been adopted contemporaneously with any amendment to any other section of this article which permits limited gaming, and, except for subsection 2(a), this section shall not affect, nor shall it be affected by, any other such section.

At the January 16 meeting, the proponents explained that subsection 3 of the January 13 document was designed to ensure that the existing provisions of article XVIII, section 9, of the Colorado Constitution did not limit the authority granted to regulatory entities by the proposed new section with respect to regulation of limited gaming in the city of Idaho Springs.[5] At no point during the January 16 meeting did the proponents state that the combined effect of subsections 2(a), 2(b) and 3 of the January 13 document was to grant regulatory entities authority to regulate limited gaming in places other than the city of Idaho Springs.[6] To the contrary, during that meeting the proponents consistently

**5.** Article XVIII, section 9, of the Colorado Constitution contains provisions authorizing limited gaming in the City of Central, the City of Black Hawk, and the City of Cripple Creek; creating a limited gaming control commission to administer and regulate the provisions of section 9; defining the term "limited gaming" to mean "the use of slot machines and the card games of blackjack and poker, each game having a maximum single bet of five dollars"; establishing regulations regarding the structures wherein limited gaming may occur; and providing for the distribution of portions of revenues obtained from limited gaming by licensees.

**6.** The record does contain the following colloquy between Mr. Bill Hobbs, representing the office of legislative legal services, and Mr. Joe Stern, representing the proponents:

MR. HOBBS: Let me ask a general question which relates to some of these things: Where the measure provides this limited gaming is authorized in the new section—
MR. STERN: Yes.
MR. HOBBS:—it is subject to all the regulations promulgated by the Commission. Is—

can the Commission have a special set of rules for just Idaho Springs or is it the intent that it has to be uniform or nondiscriminatory?
MR. STERN: Well, we would like to see gaming eventually uniform. It's, right now, obviously in a formation stage where there could be several cities that have it under several different laws. It may be, as a practical matter, that the Commission may have to make certain rules for each city. I don't know. But because of that possibility, we've tried to give it the discretion it needs to fit our square peg into a round hole, so to speak, because that is a very likely problem....
This discussion centers on concerns about how the regulatory entities would administer different rules created by separate constitutional amendments authorizing limited gaming in specified locations. In context, it does not suggest that the proponents intended the January 13 document to authorize limited gaming in places other than Idaho Springs.

indicated that their proposal was directed to limited gaming in that city.

It is clear from the record of the February 12 meeting and the February 28 hearing that the language of subsections 2(a) and 3 of the proposed amendment was intended by the proponents thereof to grant regulatory entities authority to approve all forms of casino games and a minimum maximum wager limit of five dollars in places other than the city of Idaho Springs. The discussions by the Board members concerning the adoption of language appropriate to express the meaning of subsections 2(a) and 3 of the proposed amendment reflect some uncertainty by the Board itself about the contents of those subsections. The change from a proposal intended to establish constitutionally authorized regulatory provisions for limited gaming only in the city of Idaho Springs to a proposal intended to establish such regulatory provisions for limited gaming in places other than that city is substantial.

One purpose of the public meeting with the legislative offices as required by article V, section 1(5), of the Colorado Constitution and section 1-40-101(1), 1B C.R.S. (1991 Supp.), is to encourage linguistic refinement of drafts of proposed initiatives. *In re Tax Reform*, 797 P.2d at 1287. While proponents are not required to amend an initial draft proposal in light of comments made at such meeting, they may choose to do so in an effort to insure that any ultimate constitutional or statutory language clearly articulates the intent and meaning of the proposal. Such clarifying amendments to initial drafts of initiatives are to be encouraged.

However, the adoption of language in a subsequent draft of a proposal that substantially alters the intent and meaning of central features of the initial proposal presents a different situation. In that circumstance, the revised document in effect constitutes an entirely different proposal from the one previously reviewed by the legislative offices. Pursuant to article V, section 1(5) of the Colorado Constitution and section 1-40-101(1), new proposals must be submitted to the legislative offices for comment at a public meeting. The public's right to understand the contents of an initiative in advance of its circulation would be completely eradicated if the intent and meaning of the central features of a proposal submitted to the Board for the purpose of fixing a title thereto is substantially different from the intent and meaning of the central features of an earlier version thereof that was submitted to the legislative offices.

Subsections 2(a) and 3 of the proposed amendment are intended to extend the applicability thereof to cities other than Idaho Springs. The January 13 document was intended to apply only to the city of Idaho Springs. This substantial alteration of the intent and meaning of a central feature of the initial proposal in effect creates a new proposal that must be submitted to the legislative offices for comment at a public meeting. In the absence of such meeting, the Board had no authority to fix a title for the proposed amendment.[7]

## V

■ Upright contends that the title, ballot title and submission clause and summary are inaccurate and misleading insofar as they state that under the proposed amendment the authority of the limited gaming control commission or other regulatory entity to approve casino games and establish minimum maximum wagers is "statewide" in scope. We agree.

7. Petitioner Klodzinski also argues that the absence of language in the proposed amendment limiting efforts to establish limited gaming in additional areas of Colorado to the initiative process constitutes an additional significant change from the January 13 document, which document did contain such limiting language. In our view, the change accomplished by that deletion does not constitute so substantial an alteration of the primary thrust of the proposed initiative as to require resubmission to the legislative offices for a new meeting. *See In re Tax Reform*, 797 P.2d at 1287; *In re Title, Ballot Title and Submission Clause, and Summary Pertaining to the Casino Gaming Initiative Adopted on April 21, 1982*, 649 P.2d 303, 310–11 (Colo.1982); *In re Second Initiated Constitutional Amendment Respecting the Rights of the Public to Uninterrupted Service by Public Employees of 1980*, 200 Colo. 141, 147, 613 P.2d 867, 871 (1980).

The proposed amendment, consisting of three subsections, adds a new section to article XVIII of the Colorado Constitution. The initial subsection provides that "limited gaming shall be lawful on ... property in the city of Idaho Springs...." The second subsection provides that "[l]imited gaming *authorized by this section*" shall be subject to all regulations adopted by any regulatory entity having responsibility for regulating limited gaming and establishes six exceptions to the applicability of any such regulations to limited gaming authorized by the proposed amendment (emphasis added). Among those six exceptions is the following:

[2) ](a) The commission or other such body shall have the authority to approve any casino games and establish the maximum wager, which shall not be less than five dollars....

The third subsection states in full as follows:

3) This section shall be deemed not to have been adopted contemporaneously with any amendment to any other section of this article which permits limited gaming, and, except for subsection 2(a), this section shall not affect, nor shall it be affected by, any other such section.

The language of subsection 1 of the proposed amendment expressly applies to limited gaming in the city of Idaho Springs. The reference in the second subsection to limited gaming "authorized by this section" is most naturally read to refer to the limited gaming in the city of Idaho Springs stated in subsection 1 to be the extent of the effect of the proposed amendment. Subsection 3 articulates principles for construing the proposed new constitutional section together with other sections of the constitution pertaining to limited gaming. When read together as a whole, the three subsections appear to relate to limited gaming operations only on property located in the city of Idaho Springs.

The title and ballot title and submission clause prepared by the Board state that the proposed amendment would "allow the limited gaming control commission to approve, statewide, any casino games and to establish a statewide maximum wager of at least five dollars." The summary prepared by the Board contains substantially similar language. Those provisions indicate to a potential voter that the proposed amendment is applicable to limited gaming throughout the state. As we have noted, the language of the proposed amendment appears to limit the applicability thereof to the city of Idaho Springs. The Board and the proponents argue that the choice of the term "statewide" is appropriate because the proposed amendment in effect permits a regulatory entity to approve casino games and set minimum maximum wager limits of five dollars in the cities of Central City, Black Hawk and Cripple Creek as well as in the city of Idaho Springs. During the February 12 meeting and the February 28 hearing the proponents observed that subsection 3 provides that subsection 2(a) shall affect and be affected by other sections of article XVIII. Noting that the only section of article XVIII relating to limited gaming is section 9 thereof, which by its terms applies to Central City, Black Hawk and Cripple Creek, the proponents argued that subsections 2(a) and 3, when read together, establish that regulatory entities may approve casino games and establish minimum maximum wager limits of five dollars in those three cities as well as in the city of Idaho Springs. The proponents stated that the language of subsections 2(a) and 3 of the proposed amendment was designed to achieve such result.

Assuming that the combination of subsection 2(a) and subsection 3 of the proposed amendment achieve this result, the term "statewide" does not indicate to potential voters that the proposed amendment will affect regulation of limited gaming in four cities only. To the extent the Board's choice of the word "statewide" is meant to convey the thought that, depending on future expansion of locales wherein limited gaming may occur, regulatory entities may in the future exercise authority throughout the state, the word is misleading because in context it connotes an actual condition rather than some possible future state of affairs.

We will not interfere with the Board's discretion in choosing language if that choice clearly and concisely reflects the central features of a proposed initiative. *In re Limited Gaming in Manitou Springs, et al.,* 826 P.2d at 1245. However, if the Board's choice of language is inaccurate or misleading with respect to the meaning and intent of a proposed initiative, thus inevitably inviting voter confusion, the Board's choice of language cannot stand. *Id.; In re Tax Reform,* 797 P.2d at 1288.

The proposed amendment is intended to have only limited geographical application. Because the term "statewide" appearing in the title, ballot title and submission clause and summary does not suggest any geographical limitation on the effect of the proposed amendment, such term can only mislead voters who rely on those documents in determining whether to adopt or reject the proposal.

## VI

For the foregoing reasons, we reverse the Board's ruling and remand the case to the Board with directions to dismiss the proceeding.

MULLARKEY, J., dissents and files an opinion in which ERICKSON and VOLLACK, JJ., join.

## APPENDIX A

BE IT ENACTED BY THE PEOPLE OF THE STATE OF COLORADO:

Article XVIII of this constitution is hereby amended as follows:

Section 10. Limited gaming permitted.

1) Notwithstanding any other provisions of this constitution, as of January 1, 1993, limited gaming shall be lawful on any property in the city of Idaho Springs which is either commercial or used for commercial purposes, as set forth in city ordinances enacted by November 3, 1992.

2) Limited gaming authorized by this section shall be subject to all regulations promulgated by any commission or other such body created by the general assembly for this or a similar purpose, with the following exceptions:

(a) The commission or other such body shall have the authority to approve any casino games and establish the maximum wager, which shall not be less than five dollars;

(b) Limited gaming may be conducted in establishments licensed to sell alcoholic beverages;

(c) No more than 50 percent of the total square footage, up to 5000 square feet, of any building may be used for limited gaming, with any existing building bound by its dimensions prior to any remodeling or renovation and any new building bound by the dimensions of any building it replaces which existed on November 3, 1992;

(d) Any applicant for a gaming license who, on November 3, 1992, holds a financial or equity interest of at least five percent in the ownership of property in or on which limited gaming may be conducted shall enjoy a presumption of good moral character, unless such person has been or is convicted of a criminal offense, and the state shall bear the cost of any investigation pursuant to that person's application;

(e) Revenues from limited gaming shall be distributed to the city of Idaho Springs and the county of Clear Creek in the same manner and proportion as that for other areas in the state from which similar revenues are derived; and

(f) The following additional taxes shall be imposed upon the adjusted gross proceeds for each licensee, which shall be deposited into a local limited gaming fund hereby created in the state treasury and distributed on a quarterly basis:

(I) Seven and one-half percent to Clear Creek County, of which six percent shall be used for emergency services and the sheriff's department, 15 percent for facilities in and maintenance of the metro-recreation district, 38 percent for education, and 35 percent for the reduction of property taxes and for other matters which the county commissioners shall determine; and

(II) One and three quarters percent to Idaho Springs, of which 15 percent shall be used for the promotion of tourism, 55 percent for municipal improvements, and 30 percent for equipment and personnel in the police department.

These bodies shall decide how to use any surplus revenue from these taxes, which shall be determined from the annual budgets they submit.

3) This section shall be deemed not to have been adopted contemporaneously with any amendment to any other section of this article which permits limited gaming, and, except for subsection 2(a), this section shall not affect, nor shall it be affected by, any other such section.

## APPENDIX B

BE IT ENACTED BY THE PEOPLE OF THE STATE OF COLORADO:

Article XVIII of this constitution is hereby amended as follows:

Section 10. Limited gaming permitted.

1) Notwithstanding any other provisions of this constitution, as of January 1, 1993, limited gaming shall be lawful on any property in the city of Idaho Springs which is either commercial or used for commercial purposes, as set forth in city ordinances and determined by November 3, 1992.

2) Limited gaming authorized by this section shall be subject to all regulations promulgated by any commission or other such body created by the general assembly for this or a similar purpose, with the following exceptions:

(a) Any casino games may be approved by the commission or other such body;

(b) The maximum wager, which shall not be less than five dollars, shall be established by the commission or other such body;

(c) Limited gaming may be conducted in establishments licensed to sell alcoholic beverages;

(d) Any structure in which limited gaming is conducted must conform to the requirements of all applicable city ordinances, and no more than 50 percent of its total square footage, up to 5000 square feet, may be used for limited gaming, with any remodeled or renovated structure bound by its dimensions on November 3, 1992 and any new structure bound by the dimensions of any structure it replaces which existed on that date;

(e) Any person having a financial or equity interest of at least five percent in the ownership of a structure in which, or property on which, limited gaming may be conducted, and who holds that interest on November 3, 1992, shall be presumed to be of good moral character, unless such person has been convicted of a criminal offense, and the cost of any investigation pursuant to a gaming license application by such person shall be borne by the state;

(f) Revenues from limited gaming shall be distributed to the city of Idaho Springs and the county of Clear Creek in the same manner as that for other areas in the state from which similar revenues are derived; and

(g) The following additional taxes shall be imposed upon the adjusted gross proceeds of each licensee, which shall be deposited into a local limited gaming fund hereby created in the state treasury and distributed accordingly on a quarterly basis;

(I) One percent to the police department of the city of Idaho Springs, for equipment and personnel;

(II) One percent to the metro-recreation district of Clear Creek County, for facilities and maintenance;

(III) 1.25 percent to the city of Idaho Springs, four fifths of which shall be used for municipal improvements and one fifth used to promote tourism;

(IV) Three percent to the school district of Clear Creek County; and

(V) Three percent to Clear Creek County, for the reduction of property taxes.

3) This section shall not affect limited gaming permitted by any other section of this article; however, no form of limited gaming may be expanded to other areas

within the state except by the initiative process pursuant to section 1 of article V of this constitution.

Justice MULLARKEY dissenting:

The majority holds that the Initiative Title Setting Board (Board) lacked jurisdiction to set the title, ballot title and submission clause and summary for a proposed amendment to the constitution regarding limited gaming in the town of Idaho Springs, Colorado. The majority also holds that the title, ballot title and submission clause and summary are misleading. Because I would find that the Board has jurisdiction to set the title and summary for the proposed amendment and that the Board's title and summary are adequate, I respectfully dissent.

The proposed amendment would add a new Section 10 to Article XVIII of the Colorado Constitution and allow gaming in Idaho Springs. Pursuant to the constitutional and statutory provisions, the proponents submitted an original draft of the proposed amendment to the legislative research and drafting offices. The legislative offices presented the proponents with a review of, and comments on, the proposed amendment at a public meeting held on January 16, 1992. In response to the review and comments by the legislative offices, the proponents amended the draft of their proposed initiative and submitted this amended draft to the Board. The Board set the title and summary to the amended draft of the proposed amendment.

The majority finds that the amended draft substantially differs from the original draft such that another public meeting was required. No second meeting having been held, the majority holds that the Board was without jurisdiction to set the title and summary. In my view, the amendments made in the draft proposal responded to comments made by the legislative offices. A second public meeting was not required and the Board therefore had jurisdiction to set the title and summary.

In *In the Matter of the Title, Ballot Title and Submission Clause, and Summary Adopted May 16, 1990 by the Board and Pertaining to the Proposed Initiative Under the Designation "Tax Reform"*, 797 P.2d 1283, 1285 (Colo.1990) (hereinafter *In re Tax Reform*), we noted that the comments made by the legislative offices

are not binding on the proponents of an initiative, although the proponents may choose to amend the initiative in light of such comments. [Article V, Section 1(5)] requires only that the original text of a proposed initiative be submitted for review and comment; there is no requirement for submission of an amended initiative after the original has been submitted.

Moreover, section 1–40–101(1) provides that "[a]fter the public meeting but before submission to the secretary of state for title setting, the proponents may amend the petition in response to some or all of the comments" of the legislative offices. Only the *"original* draft of [a] proposed initiative"* must be submitted to the legislative offices. *In re Tax Reform*, 797 P.2d at 1287 (quoting Legislative Council of the Colorado General Assembly, *An Analysis of 1980 Ballot Proposals*, Research Publication No. 248 (1980) at 3 (emphasis in original)). Thus, by the direct authority of the constitution and statute, the proponents of a measure are allowed to amend their original draft and to submit that amended draft to the Board without returning to the legislative offices for another public meeting.

Our task, then, is to distinguish between a draft which is amended within the bounds of the constitution and statutes and a draft which is so altered that it is a separate and distinct proposal such that another public meeting is required. Between an original draft which has received only *minor* amendments and an amended draft which differs *substantially* from the original, there is that draft which has been evidently and sensibly amended to reflect the comments presented by the legislative offices. I would hold that such an amended draft does not require another public meeting. When a review of the written comments of the legislative offices or the transcript of the public meeting indicates that the com-

ments by the legislative offices included concerns, suggestions or recommendations which were eventually reflected in amendments made by the proponents after the meeting but before submission to the Board, then such an amended draft should not be deemed so different from the original such that another public meeting is required.[1]

Comparing the amended draft to the original draft here, I find that although there are differences, such differences reflected certain comments made or concerns raised at the public meeting with the legislative offices. Because the standard discussed above has been met, no second public meeting is required for the amended draft.

The controversy here revolves around subsection 3 of the respective drafts of the proposal. In the original draft, subsection 3 read:

> This section shall not affect limited gaming permitted by any other section of this article; however, no form of limited gaming may be expanded to other areas within the state except by the initiative process pursuant to section 1 of Article V of this constitution.

Subsection 3 of the amended draft reads:

> This section shall be deemed not to have been adopted contemporaneously with any amendment to any other section of this article which permits limited gaming, and, except for subsection 2(a), this section shall not affect, nor shall it be affected by, any other such section. .

Subsection 2(a) of the amended draft provides that the gaming commission may approve any casino game and that the maximum wager cannot be less than five dollars. The majority holds that subsection 3 of the amended draft is substantially different from subsection 3 of the original

draft. It describes the change as a "substantial alteration of the intent and meaning of a central feature of the initial proposal [which] in effect creates a new proposal that must be submitted to the legislative offices for comment at a public meeting." Maj. op. at 968.

I dispute whether this is a "substantial alteration" or a "central feature" of the original proposal. The purpose of this amendment is to authorize limited gaming in Idaho Springs and that is unchanged. During the public meeting with the legislative offices, the question arose of uniform regulation of all gaming locales. At that meeting, the following colloquy took place between Mr. Hobbs, a representative of the legislative offices, and Mr. Stern, one of the proponents of the measure:

> Mr. Hobbs: Let me ask a general question.... Where the measure provides this limited gaming is authorized in the new section—
>
> Mr. Stern: Yes.
>
> Mr. Hobbs:—it is subject to all the regulations promulgated by the [regulatory] Commission. Is—can the Commission have a special set of rules for just Idaho Springs or is it the intent that it has to be uniform or nondiscriminatory?
>
> Mr. Stern: Well, we should like to see gaming eventually uniform. It's, right now, obviously in formation stage where there could be several cities that have it under several different laws. It may be, as a practical matter, that the Commission may have to make certain rules for each city. I don't know. But because of that possibility, we've tried to give it the discretion it needs to fit our square peg into a round hole, so to speak, because that is a very likely problem.

---

1. This standard is not in tension with our decision in *In re Tax Reform.* There, the proponents argued that the "legislative offices had an opportunity to examine provisions" of a second initiative proposal since the provisions of that second proposal "were substantially the same" as the provisions of an earlier proposal. However, the Board had already set the title and summary of the earlier measure in effect completing this stage of the process. The propo-

nents then submitted a second proposal to the Board without first submitting it to the legislative offices for review and comment. The two proposals concerned the same subject but were quite different in content. We concluded that the public meeting for the first proposal "cannot serve as the constitutionally required predicate for setting two different titles for two initiatives." 797 P.2d at 1285–87.

The majority at p. 967, n. 6, interprets this exchange, when taken in context, as indicating that the proponents did not intend to authorize gaming in any location other than Idaho Springs. This analysis misses the point. I agree that the proponents did not intend to extend gaming to other locations. What they intended to authorize, however, was uniform regulation of gaming (to the extent uniformity was appropriate) in all places where gaming was permitted. Limited gaming now is permitted by Article XVIII, Section 9 in Central City, Black Hawk and Cripple Creek. It is proposed for several other locations including Manitou Springs, Fairplay, in airports and Parachute. *See In the Matter of the Title, Ballot Title and Submission Clause Approved February 12, 1992, With Regard to the Proposed Initiated Constitutional Amendment Concerning Limited Gaming in the Town of Parachute (Moratorium on Limited Gaming)*, No. 92SA97, —— P.2d —— (Colo. May 18, 1992); *In the Matter of the Title, Ballot Title and Submission Clause Approved September 4, 1991, With Regard to the Proposed Initiated Constitutional Amendment Concerning Limited Gaming in Manitou Springs, Fairplay and in Airports*, 826 P.2d 1241 (Colo.1992) (hereinafter *In re Limited Gaming in Manitou Springs*). The proponents and legislative officials discussed the other gaming communities and the desirability of some uniform regulation. As long as the legislative offices comment on or suggest a change in the original draft which is then reflected in the amended draft, it makes no difference whether the proponents did or did not intend the substance of the change in their initial draft. In other words, I would hold the proponents of a measure may amend their intentions along with their draft as long as such amendments are reflections of comments made by the legislative offices.[2]

To reach the contrary result, as the majority does, is to thwart the intent of the constitution and implementing statutes. Proponents of an initiative will be extremely reluctant to amend their proposal to respond to meritorious comments of the legislative offices if such an amendment can be seized upon by their opponents as a way to derail the initiative. The cautious proponent would not make the smallest of changes without seeking a new public meeting. Certainly the purpose of requiring review and comment by the legislative offices is to improve the drafting of initiatives. This court should encourage, not discourage, attempts by proponents to follow suggestions which will improve the proposals submitted to the voters.

The majority also states that the "public's right to understand the contents of an initiative in advance of its circulation would be completely eradicated if the intent" of the draft submitted to the Board differs in some respects from the intent of the draft submitted to the legislative offices. Maj. op. at 968. The Board, however, is required to set a title and summary which "correctly and fairly express[es] the true intent and meaning" of the "original or amended draft[ ], as the case may be." § 1–40–101(2). The draft which is then circulated to the voters is the draft which has been submitted to the Board and for which the Board has set a title and summary expressive of its intent and meaning. Thus, although the public's understanding of the proposed measure may begin at the public meeting with the legislative offices, it does not end there. The title setting process is also a public meeting at which the language and intent of the initiative is again explored. Further, it is the proposed measure's title and summary, as set by the Board, which is circulated to the voters and to the media, and which in practice contrib-

---

**2.** Thus, the amended draft also deleted language which would confine any effort to expand limited gaming to other areas of Colorado to the initiative process in response to legislative comments on the futility of this provision, since another initiative could defeat it. Unlike the majority, which viewed this change as not being substantial enough to require resubmission to

the legislative offices for comment, *maj. op.* at n. 7, p. 968, I consider this change a reflection of the review and comments by the legislative offices and for that reason the change is an amendment within the bounds of the constitution and statute and which therefore *does not* require another public meeting.

utes most to the public's understanding of the proposed initiated amendment. Thus, amending an original draft to reflect the legislative office's comments and/or recommendations can hardly be said to eradicate the public's understanding.

Finally, in addition to finding that the Board lacked jurisdiction, the majority agrees with the petitioners' argument that the reference to "statewide" regulation in the title and summary of the proposed measure as set by the Board "are inaccurate and misleading." The language of the initiative does not support the majority's conclusion that the proposed amendment "relate[s] to limited gaming operations only on property located in the city of Idaho Springs." Maj. op. at 969. Subsection (3) provides in relevant part that:

> [E]xcept for subsection 2(a), this section shall not affect, nor shall it be affected by, any other such section [which permits limited gaming].

Stated in positive terms, subsection 2(a) applies to any other section of the constitution authorizing limited gaming. Subsection 2(a), thus, permits the gaming commission to "approve any casino games and establish the maximum wager which shall not be less than five dollars" for all communities in which limited gaming is constitutionally allowed.

The Board correctly interpreted the proposed initiative. To convey the increased powers of the gaming commission, the Board inserted the following relevant language in the title:

> An amendment to Article XVIII of the Colorado Constitution ... to allow the limited gaming control commission to approve, statewide, any casino games and to establish a statewide maximum wager of at least five dollars....

The same language was included in the ballot title and submission clause and summary. *See* maj. op. at 965. The majority rejects the term "statewide" as misleading because the amendment "is intended to have only limited geographical application." Maj. op. at 970. In fact, that observation is not correct. The gaming commission is intended to exercise its regulatory authori-

ty on a statewide basis wherever limited gaming is permitted. "Statewide" is an appropriate, nonmisleading summary of the initiative. With appropriate deference to the Board's selection of language, *In re Limited Gaming in Manitou Springs*, 826 P.2d at 1245, I would uphold the inclusion of the term "statewide" in the title and summary.

For these reasons, I dissent.

ERICKSON and VOLLACK, JJ., join in this dissent.