In the Matter of the TITLE, BALLOT TITLE, SUBMISSION CLAUSE, AND SUMMARY ADOPTED APRIL 17, 1996, BY the TITLE SETTING BOARD PERTAINING TO a PROPOSED INITIATIVE STATUTE PROPOSED BY ARTHUR APPLE AND JAMES MEEKER (1996–17).

Frederick W. JONES, Derrick Pickeral, Nancy L. Reubert, James Scott, Lori R. Williams, and James L. Brandon, Petitioners,

v.

Arthur APPLE and James Meeker, Respondents,

and

Victoria Buckley, Rebecca Lennahan, and Richard Westfall, Title Setting Board.

No. 96SA177.

Supreme Court of Colorado, En Banc.

June 24, 1996.

Brownstein Hyatt Farber & Strickland, Hubert A. Farbes, Jr., Gary M. Reiff, Stephen D. Gurr, Denver, for Petitioners Frederick W. Jones, Derrick Pickeral, Nancy L. Reubert, James Scott and Lori R. Williams.

Berry & Singer, John Berry, Denver, for Petitioner James L. Brandon.

Friedlob Sanderson Raskin Paulson & Tourtillott, LLC, Christopher R. Paulson, James W. Sanderson, Denver, for Respondents Arthur Apple and James Meeker.

Gale A. Norton, Attorney General, Timothy M. Tymkovich, Solicitor General, Maurice G. Knaizer, Deputy Attorney General, State Services Section, Denver, for Title Setting Board.

PER CURIAM.

The petitioners, Frederick W. Jones, Derrick Pickeral, Nancy L. Reubert, James Scott, and Lori R. Williams (the Jones petitioners), and James L. Brandon, are registered electors of Colorado who bring this original proceeding pursuant to section 1–40–107(2), 1B C.R.S. (1995 Supp.), to review the action taken by the initiative title setting board (the Board) in fixing a title, ballot title and submission clause, and summary (titles and summary) for a proposed statutory amendment designated "1996–17" (the Initiative). We hold that while the Initiative does not violate the single-subject requirement applicable to initiatives under article V, section 1(5.5), of the Colorado Constitution, the titles and summary do not fairly express the intent and meaning of the initiative, and the fiscal impact statement is inaccurate. We therefore reverse the action of the Board.

I.

The Initiative seeks to add a new section, section 42–4–302.5, to part 3 of article 4 of title 42 of the Colorado Revised Statutes:

*Be it enacted by the People of the State of Colorado:*

**SECTION 1. Part 3 of article 4 of title 42, Colorado Revised Statutes, 1993 Repl. Vol., as amended, is amended BY THE ADDITION OF A NEW SECTION to read:**

**42–4–302.5. Direction to the air quality control commission to create an enhanced emissions program providing for consumer choice.** (1) THE COMMISSION IS DIRECTED TO REVISE THE CURRENT ENHANCED EMISSIONS PROGRAM NO LATER THAN JULY 1, 1997. THE COMMISSION SHALL DEVELOP AND PROMULGATE BY RULE A PROGRAM WHICH MEETS THE CRITERIA LISTED IN THIS SECTION. IF THE PROGRAM HAS NOT BEEN REVISED AND SUBMITTED BY NOVEMBER 1, 1997 FOR APPROVAL REQUIRED UNDER THE FEDERAL CLEAN AIR ACT, THE GENERAL ASSEMBLY SHALL ENACT A PROGRAM WHICH COMPLIES WITH THIS SECTION, TO BE IMPLEMENTED BY JULY 1, 1998. THE GENERAL ASSEMBLY SHALL ALSO MAKE ANY NECESSARY CHANGES TO EXISTING LAW TO IMPLEMENT THE MANDATE TO THE COMMISSION TO EXPAND CONSUMER CHOICE.

(2) THE PROGRAM REQUIRED BY THIS SECTION SHALL ENHANCE CONSUMER CONVENIENCE AND PROVIDE CONSUMER CHOICE OF INSPECTION FACILITIES, INCLUDING ENHANCED INSPECTION CENTERS, INSPECTION–ONLY FACILITIES, INSPECTION AND READJUSTMENT STATIONS, MOTOR VEHICLE FLEET–BASED INSPECTION FACILITIES AND NEW AND USED MOTOR VEHICLE DEALER INSPECTION FACILITIES. THE COMMISSION SHALL SELECT FROM AVAILABLE TECHNOLOGIES AND PROGRAMMATIC APPROACHES IN DEVELOPING THE MOST COST EFFECTIVE PROGRAM, WHICH CREATES, PURSUANT TO THIS SECTION, AN ENHANCED INSPECTION PROGRAM WHICH PROVIDES CHOICE TO THE PUBLIC TO USE SUCH INSPECTION CENTERS, FACILITIES, STATIONS, OR DEALER INSPECTION FACILITIES IN ADDITION TO THE CENTRALIZED ENHANCED INSPECTION STATIONS OF THE CURRENT PROGRAM.

(3) THE PROGRAM REQUIRED BY THIS SECTION MUST ACHIEVE BENEFITS WHICH, USING REASONABLE SCIENTIFIC METHODS ARE DETERMINED TO BE EQUAL TO OR GREAT-

ER THAN THE AIR QUALITY BENE-
FITS WHICH WERE CALCULATED
TO RESULT FROM THE PROGRAM IN
EXISTENCE ON JANUARY 1, 1996
WITH RESPECT TO REDUCTIONS OF
PARTICULATE MATTER, PM–10, CAR-
BON MONOXIDE, OZONE, NITROGEN
OXIDE AND WHICH WILL NOT JEOP-
ARDIZE THE ABILITY TO MAKE
TRANSPORTATION CONFORMITY
FINDINGS AS REQUIRED BY FED-
ERAL LAW.

(4) PRIOR TO THE ADOPTION OF
THE PROGRAM REQUIRED BY THIS
SECTION, THE COMMISSION SHALL,
FOLLOWING A COMPETITIVE BID
PROCESS, CONTRACT WITH A PRI-
VATE INDEPENDENT CONTRACTOR
FOR THE CONDUCT OF AN OBJEC-
TIVE STUDY. SUCH STUDY SHALL
EVALUATE AVAILABLE ALTERNA-
TIVES AND IDENTIFY THE COST EF-
FECTIVE OPTIONS FOR CREATING A
PROGRAM WHICH MEETS THE RE-
QUIREMENTS OF THIS SECTION.
THE COMMISSION SHALL UTILIZE
THE RESULTS OF SUCH STUDY TO
ESTABLISH THE PROGRAM RE-
QUIRED BY THIS SECTION. FOR
PURPOSES OF FUNDING THE
STUDY, THE COMMISSION SHALL
SPEND NO MORE THAN THE
AMOUNT RECOVERED BY THE
STATE OF COLORADO IN FINES OR
PENALTIES AS OF JANUARY 1, 1996,
FROM THE CONTRACTOR CURRENT-
LY OPERATING THE ENHANCED IN-
SPECTION CENTERS.

The titles and summary set by the Board
are attached as an appendix to this opinion.
The Jones petitioners assert that (1) the
titles and summary are misleading because
they fail to disclose that the Initiative will
affect only the six-county Denver metropoli-
tan area; (2) the titles and summary do not
express the intent and meaning of the Initia-
tive because they do not disclose that any
proposed changes to the enhanced emissions
program must be submitted for approval un-
der the federal Clean Air Act; (3) the sum-
mary inaccurately describes the fiscal impact
of the Initiative; and (4) the Board inappro-
priately interpreted the meaning and effects
of the Initiative in order to avoid disclosing
its specific fiscal impacts.

Petitioner Brandon claims that the Board's
action should be reversed because: (1) the
Initiative encompasses more than one sub-
ject; (2) the "single subject" of the title does
not clearly express the Initiative's true intent
and meaning; (3) the titles and submission
clause do not express the true meaning and
intent of the Initiative; and (4) the titles and
submission clause are unfair and misleading
because they do not disclose that if the Ini-
tiative fails to equal the clean air program
existing on January 1, 1996, then there will
be no change in the current program.

## II.

■ Petitioner Brandon first asserts that
the Board should not have set the titles and
summary because the Initiative encompasses
more than one subject. We disagree.

Article V, section 1(5.5), of the Colorado
Constitution provides:

No measure shall be proposed by peti-
tion containing more than one subject,
which shall be clearly expressed in its title;
but if any subject shall be embraced in any
measure which shall not be expressed in
the title, such measure shall be void only
as to so much thereof as shall not be so
expressed. If a measure contains more
than one subject, such that a ballot title
cannot be fixed that clearly expresses a
single subject, no title shall be set and the
measure shall not be submitted to the peo-
ple for adoption or rejection at the polls.

■ Section 1–40–106.5, 1B C.R.S. (1995
Supp.), explains the general assembly's pur-
pose for proposing the single-subject amend-
ment. The single-subject requirement limits
the scope of an initiative to a single subject
which must be clearly expressed in its title.
§ 1–40–106.5(1)(a). Further, "in setting ti-
tles pursuant to section 1(5.5) of article V,
the initiative title setting review board creat-
ed in section 1–40–106 should apply judicial
decisions construing the constitutional single
subject requirement for bills and should fol-
low the same rules employed by the general

assembly in considering titles for bills." § 1–40–106.5(3).

The requirement that an initiative be limited to a single subject is intended to ensure that each proposal depends upon its own merits for passage. § 1–40–106.5(1)(e)(I), 1B C.R.S. (1994 Supp.); *see also In re House Bill No. 1353,* 738 P.2d 371, 372 (Colo.1987) (interpreting the single subject requirement for bills). In furtherance of this purpose, the single subject requirement forbids the joining of "incongruous subjects in the same measure." § 1–40–106.5(1)(e)(I).

In order to constitute more than one subject under our caselaw pertaining to bills, the text of the measure must relate to more than one subject and it must have at least two distinct and separate purposes which are not dependent upon or connected with each other. Thus, if the initiative tends to effect or to carry out one general object or purpose, it is a single subject under the law.

*In re Proposed Initiative "Public Rights in Waters II",* 898 P.2d 1076, 1078 (Colo.1995). The subject matter of a bill must be "necessarily or properly connected" rather than "disconnected or incongruous," *In re House Bill No. 1353,* 738 P.2d 371, 374 (Colo.1987), in order to satisfy the single-subject requirement. The Board "is vested with considerable discretion in setting the title, ballot title and submission clause, and summary. In reviewing actions of the Title Board, therefore, we must liberally construe the single-subject requirements for initiatives." *In re Proposed Initiative on Parental Choice in Education,* 917 P.2d 292, 294 (Colo.1996) (citation omitted).

The Initiative encompasses a single subject under this analysis and it was therefore permissible for the Board to set a title and summary. As the beginning of the title set by the Board indicates, the Initiative contains the single subject of "direct[ing] the Air Quality Control Commission to revise the current enhanced emissions testing program...."

Petitioner Brandon claims that the Initiative contains at least one additional separate subject. The second separate subject ac-cording to Brandon is the condition that if the Air Quality Control Commission (the Commission) fails to act by July 1, 1997, the general assembly is to enact a conforming program.

The Initiative merely provides for alternate ways to accomplish the same result—revising the current enhanced emissions program according to the criteria set out in the Initiative. The alternate ways are related to and connected with each other and plainly do not violate the single-subject requirement. In *In re Proposed Petitions,* 907 P.2d 586 (Colo.1995), we concluded that an initiative did not violate the single-subject requirement. We said that

the text of the Initiative encompasses a single, if quite general, subject. The Initiative addresses numerous issues regarding the subject of "petitions," including both initiated and referred petitions. The Initiative defines the right to petition and establishes a battery of procedures which govern the exercise of that right. Those provisions include, among other things, various time limitations; guidelines for formatting and filing petitions; procedures for challenging ballot titles and petitions on single-subject grounds; and rules regarding printing, distribution, and format of petition forms. The Initiative prohibits limitation of peaceful petitioning on public, district-owned property; limits the number of legislative measures which may be excepted from referendum petitions; describes certain procedures related to the exception process; and provides guidelines for distribution to voters of information regarding petitions. It also defines certain terms used in the Initiative, expresses general guidelines for interpretation of petitions, and authorizes lawsuits as a remedy for violations of the proposed provisions. The provisions regarding lawsuits authorize recovery of court costs and attorney fees by successful plaintiffs and by defendants who establish that lawsuits are frivolous.

907 P.2d at 590–91. The initiative in *Petitions* was "comprehensive, [but] all of its numerous provisions relate to the single purpose of reforming petition rights and proce-

dures." *Id.* at 591. *See also In re Proposed Ballot Initiative on Parental Rights,* 913 P.2d 1127, 1139 (Colo.1996) (initiative did not violate the constitutional single-subject requirement even though it concerned parents' right to control their children in four different areas). The present Initiative contains a single subject and the Board did not err in attempting to set the titles and summary.

## III.

■ The Jones petitioners contend that the titles and summary set by the Board are misleading because they fail to disclose that the Initiative will affect only the six-county Denver metropolitan area. We agree.

■ Section 1–40–102(10), 1B C.R.S. (1995 Supp.) requires the title to be a "brief statement that fairly and accurately represents the true intent and meaning of the proposed initiative." "In setting a title, the title board shall consider the public confusion that might be caused by misleading titles and shall, whenever practicable, avoid titles for which the general understanding of the effect of a 'yes' or 'no' vote will be unclear." § 1–40–106(3)(b), 1B C.R.S. (1995 Supp.). "The language employed by the Board in fixing a title will be rejected only if it is misleading, inaccurate, or fails to reflect the central features of the proposed initiative." *In re Petition Procedures,* 900 P.2d 104, 108 (Colo.1995).

The title set by the Board in this case becomes misleading because it does not notify voters that the *current* enhanced emissions program applies only to the City and County of Denver, Boulder County, Douglas County, Jefferson County, and parts of Adams and Arapahoe Counties. § 42–4–304(20)(c), 17 C.R.S. (1995 Supp.). Because the titles and summary do not contain any indication that the geographic area to be affected is quite limited, there is a significant risk that voters statewide will misperceive the scope of the proposed Initiative. *See In re Limited Gaming IV,* 873 P.2d 733, 742 (Colo.1994) (titles and summary of proposed initiative were misleading since voter quickly scanning initiative could be misled into believing that measure concerned only one city,

but initiative also changed provisions applicable to other areas of state where limited gaming was lawful); *In re Proposed Initiated Constitutional Amendment Concerning Limited Gaming in the Town of Idaho Springs,* 830 P.2d 963, 970 (Colo.1992) (titles and summary which used the term "statewide" were misleading to voters when the proposed amendment was intended to have only limited geographical application).

The proponents argue that it would have been misleading for the Board to state that the current enhanced emissions program is limited to the six-county Denver metropolitan area because under certain prescribed conditions, parts of additional counties may be added to the enhanced emissions testing area on a case-by-case basis by order of the Commission. § 42–4–304(20)(c)(III), 17 C.R.S. (1995 Supp.). The "current" enhanced emissions program, however, applies only in the six-county area. The fact that the geographic area affected may be changed in the future does not prevent the Board from setting an accurate title at the time the Board acts.

■ The petitioners also claim that the titles and summary do not express the intent and meaning of the Initiative because they do not disclose that (1) any proposed changes to the enhanced emissions program must be submitted for approval under the federal Clean Air Act; and (2) if the Initiative fails to achieve benefits equal to those calculated to result from the clean air program existing on January 1, 1996, then there will be no change in the current program. Because we have already concluded that the titles and summary are misleading with respect to geographic limits, there is no need for an extended discussion of these other challenges. Neither of these features is central to an understanding of the Initiative, however, and "[n]ot every feature of a proposed measure must appear in the title, ballot title and submission clause." *In re Proposed Petitions,* 907 P.2d at 591. The Board's decision not to address these matters in the titles and summary would not be error. *Id.* at 592 n. 6.[1]

---

1. On remand, the Board should amend the titles as follows: "AN ACT TO DIRECT THE AIR

## IV.

 Finally, the Jones petitioners assert that the summary inaccurately describes the fiscal impact of the Initiative. We agree.

The summary must ordinarily include a fiscal impact statement in order to inform the electorate of the fiscal implications of the proposal. The Board is vested with discretion regarding how to best describe the fiscal impact without creating prejudice for or against the proposal. Explanation of the fiscal impact of a measure is not required when such impact cannot be determined from materials submitted to the Board due to uncertainties or variables inherent in the particular issue. If the Board has sufficient information to assess the fiscal impact of only certain provisions, it must provide fiscal information with regard to those provisions in isolation and should state which provisions have indeterminate impacts.

*In re Proposed Initiative on "Trespass— Streams With Flowing Water."*, 910 P.2d 21, 26 (Colo.1996) (citations omitted). Pursuant to section 1–40–106(3)(a), 1B C.R.S. (1995 Supp.), the Board received the assistance of the Office of State Planning and Budgeting (OSPB) in preparing the fiscal impact statement of the Initiative with respect to the state. The OSPB report outlined "two scenarios." The two scenarios arise directly from the Initiative's requirement that an independent study be conducted that would evaluate possible alternatives to the current enhanced emission program and identify cost effective options meeting the Initiative's criteria.

Under the first scenario, the current centralized emissions program would simply be expanded, with the present private contractor expanding its operation to include on-site repair. The OSPB indicates that "[t]he fiscal impact for this scenario would simply include the estimated cost for the independent study of feasible emissions testing alternatives." The expected cost of the study would be $275,000. The "costs for the testing facility expansions would be borne by the contractor."

In the second scenario presented by the OSPB, the entire program would be decentralized, "creating approximately 200 to 400 new testing/repair facilities." The report continues: "The Department of Public Health and Environment estimates this scenario would cost the state approximately $2.8 million in the first year of implementation, and approximately $2.4 million each ensuing year." The costs are primarily associated with the creation of an additional 11.0 full-time positions (FTE) to manage the breadth of the 200 to 400 new testing stations. In addition, the OSPB states, "The Department of Revenue has indicated that they would require 5.3 auditing FTE positions and $296,-574" under the second scenario.

Finally, the OSPB report included a report prepared by the office of state auditor to the general assembly indicating the estimated cost if the general assembly repealed the enhanced emission inspection and maintenance program.

The fiscal impact portion of the summary provides:

This measure is expected to have no direct fiscal impact on local governments in Colorado. The cost to the state of the independent study of feasible emissions testing alternatives is expected to be about $275,000, which could be paid from fines and penalties paid by Envirotest, the centralized emissions testing contractor. The Office of State Planning and Budgeting indicates that there may be a fiscal impact on the state to pay for new personnel, data collection, and remote sensing contracts, depending on the outcome of the study. Litigation may result from any change in the program and may have an indeterminate impact on the state.

QUALITY CONTROL COMMISSION TO REVISE THE CURRENT MOTOR VEHICLE ENHANCED EMISSIONS TESTING PROGRAM, AS OF NOW IN EFFECT IN THE SIX–COUNTY DENVER METROPOLITAN AREA, AND, IN CONNECTION THEREWITH," in lieu of "AN ACT TO DIRECT THE AIR QUALITY CONTROL COMMISSION TO REVISE THE CURRENT MOTOR VEHICLE ENHANCED EMISSIONS TESTING PROGRAM, AND, IN CONNECTION THEREWITH. . . ."

Initially, it was not error for the Board not to rely upon the cost estimates prepared by the office of state auditor. These cost estimates were not prepared with respect to the Initiative, and were not requested by the Board. The OSPB represented that "[t]his office cannot attest to the accuracy of those cost estimates...." It was therefore within the Board's discretion not to rely on them.

 The cost estimates prepared by the OSPB are a different matter, however. The fact that the OSPB prepared two cost estimates based on two possible scenarios does not make the costs indeterminate. Nor does the summary state that these costs are indeterminate. In the unusual case such as this where there are discrete determinable possibilities depending on the outcome of a given study, the Board should inform the voters of the costs of those outcomes. The fiscal impact statement contained in the summary is therefore inaccurate.[2]

## V.

Because the Board erred in setting a misleading title for the Initiative and in setting an inaccurate fiscal impact statement in the summary, we remand this matter to the Board with directions to amend the titles and summary consistent with this opinion.

SCOTT, J., does not participate.

## APPENDIX

### Proposed Initiative "1996–17[1]"

The title as designated and fixed by the Board is as follows:

AN ACT TO DIRECT THE AIR QUALITY CONTROL COMMISSION TO REVISE THE CURRENT MOTOR VEHICLE ENHANCED EMISSIONS TESTING PROGRAM, AND, IN CONNECTION THEREWITH, PROVIDING THAT, NO LATER THAN JULY 1, 1997, THE COMMISSION SELECT FROM AVAILABLE TECHNOLOGIES TO DE-

VELOP THE MOST COST–EFFECTIVE PROGRAM THAT PROVIDES FOR AN ENHANCED INSPECTION PROGRAM THAT GIVES THE PUBLIC A CHOICE TO USE INSPECTION CENTERS IN ADDITION TO THE CENTRALIZED ENHANCED INSPECTION STATIONS AND PROVIDES BENEFITS EQUAL TO OR GREATER THAN THE AIR QUALITY BENEFITS CALCULATED TO RESULT FROM THE CURRENT MOTOR VEHICLE EMISSIONS TESTING PROGRAM, AND THAT WILL NOT JEOPARDIZE THE ABILITY TO MAKE TRANSPORTATION CONFORMITY FINDINGS REQUIRED BY FEDERAL LAW; PROVIDING THAT IF THE COMMISSION DOES NOT REVISE THE CURRENT ENHANCED PROGRAM BY NOVEMBER 1, 1997, THE GENERAL ASSEMBLY IS DIRECTED TO MAKE SUCH REVISIONS BY JULY 1, 1998; PROVIDING THAT THE COMMISSION SHALL CONTRACT WITH A PRIVATE PARTY WHICH WOULD CONDUCT A STUDY TO EVALUATE AVAILABLE ALTERNATIVES TO THE CURRENT PROGRAM AND IDENTIFY COST–EFFECTIVE OPTIONS THEREFOR; AND PROVIDING THAT FOR SUCH STUDY THE COMMISSION IS PROHIBITED FROM SPENDING AN AMOUNT GREATER THAN THE AMOUNT GENERATED BY FINES AND PENALTIES FROM THE CONTRACTOR CURRENTLY OPERATING THE ENHANCED INSPECTION CENTERS.

The ballot title and submission clause as designated and fixed by the Board is as follows:

SHALL THERE BE AN ACT TO DIRECT THE AIR QUALITY CONTROL COMMISSION TO REVISE THE CURRENT MOTOR VEHICLE ENHANCED EMISSIONS TESTING PROGRAM, AND, IN CONNECTION THEREWITH, PROVIDING THAT, NO LATER THAN

---

2. On remand, the Board should amend the fiscal impact statement contained in the summary consistent with the cost estimates prepared by the OSPB.

1. Department Key: Air Pollution Emissions from Mobile Sources–Consumer Choice (Supreme Court Decision 1/26/96).

JULY 1, 1997, THE COMMISSION SELECT FROM AVAILABLE TECHNOLOGIES TO DEVELOP THE MOST COST–EFFECTIVE PROGRAM THAT PROVIDES FOR AN ENHANCED INSPECTION PROGRAM THAT GIVES THE PUBLIC A CHOICE TO USE INSPECTION CENTERS IN ADDITION TO THE CENTRALIZED ENHANCED INSPECTION STATIONS AND PROVIDES BENEFITS EQUAL TO OR GREATER THAN THE AIR QUALITY BENEFITS CALCULATED TO RESULT FROM THE CURRENT MOTOR VEHICLE EMISSIONS TESTING PROGRAM, AND THAT WILL NOT JEOPARDIZE THE ABILITY TO MAKE TRANSPORTATION CONFORMITY FINDINGS REQUIRED BY FEDERAL LAW; PROVIDING THAT IF THE COMMISSION DOES NOT REVISE THE CURRENT ENHANCED PROGRAM BY NOVEMBER 1, 1997, THE GENERAL ASSEMBLY IS DIRECTED TO MAKE SUCH REVISIONS BY JULY 1, 1998; PROVIDING THAT THE COMMISSION SHALL CONTRACT WITH A PRIVATE PARTY WHICH WOULD CONDUCT A STUDY TO EVALUATE AVAILABLE ALTERNATIVES TO THE CURRENT PROGRAM AND IDENTIFY COST–EFFECTIVE OPTIONS THEREFOR; AND PROVIDING THAT FOR SUCH STUDY THE COMMISSION IS PROHIBITED FROM SPENDING AN AMOUNT GREATER THAN THE AMOUNT GENERATED BY FINES AND PENALTIES FROM THE CONTRACTOR CURRENTLY OPERATING THE ENHANCED INSPECTION CENTERS?

The summary prepared by the Board is as follows:

This proposed amendment to the Colorado Revised Statutes directs the Air Quality Control Commission to revise the current motor vehicle enhanced emissions testing program no later than July 1, 1997. If the Air Quality Control Commission does not revise the current enhanced program by November 1, 1997, the General Assembly is directed to make such revisions.

The measure directs the Commission to develop a program that provides for a choice of inspection facilities, including enhanced inspection centers, inspection-only facilities, inspection and readjustment stations, motor vehicle fleet-based inspection facilities and new and used motor vehicle dealer inspection facilities. The measure directs the Commission to select from available technologies and programmatic approaches to develop the most cost-effective program that creates an enhanced inspection program that provides choice to the public to use such inspection centers, facilities, stations, or dealers in addition to the centralized enhanced inspection stations of the current program. Any program enacted pursuant to this measure must provide benefits equal to or greater than the air quality benefits calculated to result from the current motor vehicle emissions testing program with respect to the reduction of particulate matter, pm–10, carbon monoxide, ozone, and nitrogen oxide, and that will not jeopardize the ability to make transportation conformity findings required by federal law.

The measure directs the Air Quality Control Commission to contract with a private party which would conduct a study to evaluate available alternatives to the current program and identify cost-effective options for a program that meets the criteria in the measure. The measure prohibits the Commission from spending for such study an amount greater than the amount generated by fines and penalties from the contractor currently operating the enhanced inspection centers.

This measure is expected to have no direct fiscal impact on local governments in Colorado. The cost to the state of the independent study of feasible emissions testing alternatives is expected to be about $275,000, which could be paid from fines and penalties paid by Envirotest, the centralized emissions testing contractor. The Office of State Planning and Budgeting indicates that there may be a fiscal impact on the state to pay for new personnel, data collection, and remote sensing contracts, depending on the outcome of the study. Litigation may result from any

change in the program and may have an indeterminate fiscal impact on the state.

4/17/96 Hearing Adjourned 3:15 p.m.

Rehearing 5/1/96 Adjourned 3:05 p.m.